# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1267

GAIL ANDERSON,

*Plaintiff-Appellant,*

*v.*

MILWAUKEE COUNTY and MILWAUKEE
TRANSPORT SERVICES, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 C 536—**Lynn Adelman**, *Judge*.

ARGUED SEPTEMBER 28, 2005—DECIDED JANUARY 11, 2006

Before FLAUM, *Chief Judge*, and MANION and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* In this case, filed pursuant to 42 U.S.C. § 1983, Gail Anderson alleges that Milwaukee County and Milwaukee Transport Services, Inc., the operator of the Milwaukee County bus system, violated her First and Fourteenth Amendment rights by their "tariff," which prohibits the distribution of literature on county buses.

Ms. Anderson, a woman in her mid-fifties, lives in Milwaukee. She doesn't drive a car and so is a regular customer on Milwaukee's buses. But she is not, it would

appear, your typical bus rider. As anyone who rides buses in urban communities knows, most passengers mind their own business. Most avoid conversation, and many even avoid eye-contact, with other passengers. Not Ms. Anderson. She (here, of course, we take her allegations as true) has a "sincerely held religious belief" and a wish to "share her faith with those sitting next to her on the bus by talking to them and giving them religious literature." She also wants to give her literature to other passengers who pass by her seat on the bus. It's unclear just how long, and how often, she has followed her urge to share her views with other riders.

Ms. Anderson's urge to "share her faith" and the bus company's tariff collided on July 8, 2003. On that day, she boarded a bus and took a seat near the front. From there, she attempted to hand out copies of a book, later identified as "The Book of Hope." The book contains stories from the Bible. In the past, she says she has been allowed to hand out the book on the bus, but this time the driver, Rozell Smith, observed what she was doing and asked her to stop. Despite repeated requests, Ms. Anderson did not stop and, in fact, said, "I will not stop." At this point, Smith did not know the book contained religious material.

Because Ms. Anderson refused to stop handing out copies of her book, Smith called the transit system dispatch office. He spoke to dispatcher Valdis Salmins. The transcript of the call is as follows:

> Operator:   . . . 63 on 63, bus 4442, badge 2637. . . . OK, I want the company rules on passing out literature on the bus, there. I'm sure we have some kind of regulation, there. Is that possible for people to pass out literature, all different types of literature, over?
>
> Dispatch:   That's a negative. There is no solicitation of any kind allowed on our buses. (S0)

> whether it's free or for charge or what-ever. . . . Nothing is to be given out on the buses.

Operator: Well, that's affirmative on that. I thought that was a rule. I got a lady on here who's passing out books on the bus, annoying the passengers, and I told her that she couldn't do that. She told me I couldn't *stop* her from doing that, over.

Dispatch: Ok, I'll send the CPOs to intercept you. If she gets off before you're intercepted, please give us a call back.

Operator: Roger.

Mr. Salmins called system security. The transcript of that call:

CPO: CPO 8, dispatch . . . we're in the downtown area, what do you have?

Dispatch: EB from 107th and Silver Spring, I have vehicle 4442, 63 on 63, badge 2037. Female on board trying to hand out booklets. I don't know if they're religious or political, or what, but no solicitation allowed on our buses whatsoever.

Two security officers intercepted the bus, boarded it, approached Ms. Anderson, and asked whether they could talk to her off the bus. At that point, they did not know what she was handing out. After she was off the bus, Ms. Anderson told the officers about "The Book of Hope." The officers explained to her that the Transit System had a rule against distributing literature on buses. They asked her whether she wanted to board the next bus to continue her trip. Being within six blocks of her home, she decided to walk.

The "rule" discussed by the bus driver and the dispatcher is one of the "Passenger Tariffs," under which the bus system operates. The tariffs set out fare information and rules regarding passenger conduct. Tariff 116 says "No person furnished transportation under fares named in this tariff shall be permitted to enter or remain in the system's buses:  (a) For purpose of distributing any form of advertising or literature."

Based on these facts, the district judge (the Honorable Lynn Adelman) granted the defendants' motion for summary judgment. Ms. Anderson now appeals, claiming that the tariff is impermissibly vague, overbroad, and unreasonable. She also claims it discriminates against religious literature. We review a summary judgment determination as well as any questions of constitutional law under the *de novo* standard of review. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1035 (7th Cir. 2002).

We will turn first to Ms. Anderson's claims that the tariff, on its face, is unconstitutionally vague and overbroad. The tariff is vague, she says, because it is unclear what "distributing" means. She poses several hypothetical examples. For instance, is handing out one book distributing? A bus company witness said no. But, she asks, is handing out one item a day for more than one day considered distribution? How about the businessman who hands a seat mate his business card? Her examples of the outer limits of possible meanings of the word "distributing" fall short of convincing us that the tariff is unconstitutionally vague. Common sense must not be and should not be suspended when judging the constitutionality of a rule or statute.

A law is void for vagueness if it fails to give fair warning of what is prohibited, if it fails to provide explicit standards for the persons responsible for enforcement and thus creates a risk of discriminatory enforcement, and if its lack of clarity chills lawful behavior. *Grayned v.*

*City of Rockford*, 408 U.S. 104 (1972). On the other hand, the Court has said that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). There are, of course, limits to how precise language can be in the context of a law, ordinance, or, for that matter, a bus system tariff. In *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 578-79 (1973), the Court remarked that "there are limitations in the English language with respect to being both specific and manageably brief . . . ." Looking at the Civil Service Rules interpreting the then-existing version of the Hatch Act, 5 U.S.C. § 7324(a)(2), the Court said the "ordinary person exercising ordinary common sense" knows perfectly well what they mean.

Ms. Anderson's arguments that the tariff is vague are reminiscent of those in *Schultz v. Frisby*, 877 F.2d 6, 8 (7th Cir. 1989), which involved abortion opponents who wished to picket the home of an abortion provider.[1] The plaintiffs claimed that an ordinance which outlawed picketing that was "directed at" a particular home was unconstitutionally vague. We set out their concern:

> Will it be enough to go 'round and 'round the block? Could the picketers march in front of the five houses on either side of the [providers']? May they stop for one minute, or two, or five, in front of the . . . place before moving along? Surely they can't evade the law by standing in front of the . . . home and occasionally jumping one house on either side. How much longer must the route be?

We rejected these concerns in favor of common sense:

---

[1] We take the background facts from a Supreme Court decision in the same case—*Frisby v. Schultz*, 487 U.S. 474 (1988).

> No matter how clear the ordinance seems, a hundred nice questions may follow in its wake. The Constitution does not require [the town] to answer each of these before it may enforce the law. Incompleteness is a curse of language, as of human imagination. To say that precision is a precondition to enforcement is to say that no ordinance regulating speech may stand—a proposition the Supreme Court has rejected over and again.

*Id.* In our case, we cannot imagine that the tariff would have a chilling effect, for instance, on a bus-riding business-man who wanted to hand his business card to a seat mate. In short, we do not find the ordinance unconstitutionally vague.

Neither can the tariff be seen as facially overbroad. The overbreadth doctrine allows a plaintiff to ask that a law be struck down based not on how it affects the plaintiff but on how it might be applied to third parties not before the court. Because that is "strong medicine," the "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 614-615 (1973). Again, in *Virginia v. Hicks*, 539 U.S. 113 (2003), the Court emphasized that to be overbroad, the law's applica-tion to protected speech must be substantial. That simply is not the case here. The tariff is narrowly drawn and applies—as we shall see—in a limited environment. More importantly, Ms. Anderson has not shown that the tariff would significantly affect the rights of individuals not before us in any way differently from the way it affects her. Accordingly, as the Court said in *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 802 (1984), "It would therefore be inappropriate in this case to entertain an overbreadth challenge to the ordinance."

Ms. Anderson's primary contention is that to the extent the tariff prevents her from sitting on the bus and hand-

ing out literature, it is unconstitutional *as applied* to her. We agree that her activities are a form of speech protected under the First Amendment. Further, the bus is a governmentally controlled forum. But, it is well-settled that the government is not required to permit all forms of speech on all of the property it owns. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992). We use "forum analysis" to determine when the government's interest in limiting the use of its property to its intended purpose outweighs the interests of those wishing to use the property for other purposes, such as First Amendment activities. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985). Under this approach, on property that has traditionally been available for public expression, regulation of speech is subject to the highest scrutiny. Similarly, the government is bound by the same standard in the "designated public forum"—property the government has opened up for limited or unlimited public expressive activity. Finally, there is the "nonpublic forum"; that is, "[p]ublic property which is not by tradition or designation a forum for public communication . . . ." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). As Ms. Anderson properly concedes, the interior of a city-operated transit vehicle is a nonpublic forum. *See Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974).

In a nonpublic forum, the government may restrict speech to a greater extent than in a public or designated public forum. Restrictions must be viewpoint-neutral and reasonable. In other words, restrictions need only pass the test of reasonableness so long as they are not an attempt to stifle a viewpoint based on its content. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee* at 683. A restriction does not need to be "the most reasonable or the only reasonable limitation"; it does not need to be narrowly tailored; nor does the governmental interest need to be compelling. *Cornelius* at 808-809. In fact,

simple common sense is sufficient to uphold a regulation under reasonableness review. *United States v. Kokinda*, 497 U.S. 720, 734 (1990). Using this approach, the Court has found reasonable, for instance, a ban on soliciting in an airport terminal, *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, and a restriction on political advertising on public transit. *Lehman v. City of Shaker Heights. See also Children of the Rosary v. City of Phoenix*, 154 F.3d 972 (9th Cir. 1998). In *Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695, 704 (7th Cir. 1998), we found that leafleting should not be permitted in places where "pedestrian traffic will be obstructed." *See also Hawkins v. City and County of Denver*, 170 F.3d 1281 (10th Cir. 1999).

Here, the restriction is clearly reasonable. Bus passengers are a captive audience. While riding on the bus, many passengers have an interest in avoiding unwelcome communications. It is reasonable for the bus company to attempt to ensure their comfort. In *Lehman*, the Court concluded that a city was entitled to protect unwilling viewers against intrusive advertising on its buses in order to provide rapid, convenient, pleasant, and inexpensive public transportation for them. It is also reasonable to wish to avoid disagreements among passengers which the distribution of literature might inspire. Furthermore, the bus company has an interest in passenger safety. The company expresses concern that a driver could be distracted by literature distribution and that abandoned literature can cause a safety hazard and certainly a littering problem. Given the nature of the forum, a ban on the distribution of literature on buses passes constitutional muster.

Finally, Ms. Anderson also seems to claim that the restriction as applied in this case is, in fact, content-based and therefore unconstitutional. She says there is an "unwritten scheme" by which there are exceptions from the total ban on literature distribution—exceptions which arise out of the discretion bus operators have to

choose which people they will ask to stop distributing literature. She says that discretionary enforcement of the tariff results in discrimination against religious literature; therefore, the tariff is subject to strict scrutiny analysis. We see no factual basis for this claim. As we said, at the time the driver asked her to stop passing out her book, he had no idea what it was about. Neither did the security officers who took Ms. Anderson off the bus. Furthermore, Ms. Anderson offers no evidence that anyone has been allowed to distribute nonreligious literature on the bus. Her main support for her claim that enforcement is discriminatory is that the bus company has a rack behind the driver's seat which holds copies of bus route schedules and monthly newsletters. She says that if the company can provide that literature, she can pass out her book. We reject this contention out of hand. The comparison between passively providing bus riders with schedules and information about the very system on which they are riding cannot be compared to a passenger distributing literature of any kind. Ms. Anderson's argument on this point rests on thin air.

Ms. Anderson has failed in her attack on the tariff, and accordingly we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*