In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 07-1239 & 07-2623

DONALD N. HORINA,

*Plaintiff-Appellee,*

*v.*

THE CITY OF GRANITE CITY, ILLINOIS,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Southern District of Illinois.
No. 05 C 79—**Michael J. Reagan**, *Judge.*

ARGUED FEBRUARY 19, 2008—DECIDED AUGUST 7, 2008

Before MANION, KANNE, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Donald Horina filed a civil-rights action against the City of Granite City, *see* 42 U.S.C. § 1983, alleging that certain provisions of Ordinance No. 7861—the City's regulation on the manner in which individuals can distribute handbills in public—violated his First Amendment right to distribute religious literature. The district court, however, determined that the entire Ordinance is unconstitutional because the City produced no evidence showing that any restrictions on handbilling were needed to further a substantial government inter-

est. The court further awarded Horina $2,772.00 in compensatory damages, and $62,702.02 in attorneys' fees and costs. We affirm the district court's judgment that Ordinance No. 7861 is unconstitutional. However, we reverse the district court's judgment awarding Horina compensatory damages, and remand this matter so the district court can revisit the issue. And following the parties' stipulation, we order the district court to modify the amount of attorneys' fees and costs due to Horina to $43,622.02.

## I. HISTORY

The facts are undisputed. Horina is a retired teacher from St. Charles, Missouri. As part of what he believes to be his calling as a Christian to tell others about their need to be "born again," Horina regularly traveled across the Mississippi River to Granite City, Illinois, to distribute pro-life literature and Gospel tracts—small pamphlets that include Bible verses and short interpretations. Although he distributed the literature around various areas in the City, he regularly frequented the sidewalk in front of the Hope Clinic for Women, an outpatient surgical treatment center that provides abortions.

Horina would regularly place his literature on the windshields of cars parked on the city streets adjacent to the Hope Clinic, much to the chagrin of at least one individual: Nathan Lang, a security guard at the clinic. After Horina placed Gospel tracts on Lang's car on two separate occasions, Lang confronted Horina and asked him to stop placing the tracts on his car. But despite the request, in July 2003 Lang watched from afar as Horina slid a Gospel tract through the open driver's side window of his car.

In response, Lang contacted the Granite City Police Department, which, in turn, cited Horina for violating the City's ordinance prohibiting the "indiscriminate" distribution of "cards, circulars, handbills, samples of merchandise or any advertising matter whatsoever on any public street or sidewalk". However, the City later altered the charge to a violation of the City's trespass ordinance. *See* Granite City, Ill., Municipal Code tit. IX, chs. 9.60.020(D), 9.63.010. Horina pled guilty to the violation as amended, and was levied a $100 fine.

Nearly two years after Horina paid his fine he filed suit against Granite City, alleging that the City's ordinance prohibiting "indiscriminate" handbilling violated his rights under the First and Fourteenth Amendments to engage in protected speech—specifically, the distribution of religious literature. He asked the district court to enjoin the City from enforcing the ordinance and to award him monetary damages "to compensate" him "for the violation of his civil rights." The district court granted Horina's request for an injunction—a result that spurred the City to repeal its prohibition on "indiscriminate" handbilling, and to replace it with a revised regulation, Ordinance No. 7861.

Much like Granite City's earlier restriction, Ordinance No. 7861 defined "handbill" to include "any leaflet, pamphlet, brochure, notice, handout, circular, card, photograph, drawing, or advertisement printed on paper or on cardboard." However, Ordinance No. 7861 replaced the broad ban on "indiscriminate" handbilling with six separate regulations, each specifying when and how an individual could distribute literature. For instance, § 2(b) of the Ordinance stated that "[n]o person shall deposit or throw any handbill in or upon any vehicle." Section 2(c) of

the Ordinance similarly provided: "No person shall deposit, place, or throw any handbill upon any private premises which are temporarily or continuously unoccupied." Any individual who was caught handbilling outside of the Ordinance's parameters would be subject to a fine "no less than $25 and up to $500." As the City explained in the Ordinance's preamble, such restrictions were necessary to protect the City's residents' "desire to be free from unwanted intrusion, trespass, harassment, and litter."

Shortly after Granite City enacted Ordinance No. 7861, Horina amended his motion for a preliminary injunction against the ban on "indiscriminate" handbilling to include the newly enacted Ordinance. In his motion, Horina asserted that § 2(b) and § 2(c) were facially unconstitutional because they were unreasonable restrictions on the time, place, and manner in which he could place handbills on automobile windshields and unoccupied homes. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1036-37 (7th Cir. 2002). Specifically, Horina asserted that the City could not show that § 2(b)'s and § 2(c)'s restrictions served a substantial government interest because there was no proof that handbilling caused the social ills that the City claimed it had an interest in preventing—"intrusion, trespass, harassment, and litter." The district judge, Michael Reagan, pressed the City on this issue at the hearing on Horina's amended motion, and asked the City if it had any evidence "of an empirical nature to support this ordinance other than to assume [that] there is going to be intrusion . . . [and] litter." The City, however, responded that it had not completed "any specific studies with regard to the correlation between handbilling and intrusion,

trespass, harassment, and litter," and that it was, in fact, unnecessary for the City to produce evidence establishing a correlation between handbilling and those problems.

The court took Horina's amended preliminary-injunction motion under advisement. But before Judge Reagan rendered a ruling, Horina filed a motion for a judgment on the pleadings, *see* Fed. R. Civ. P. 12(c), largely reasserting the arguments he had made in his amended preliminary-injunction motion, and asking the district court to enjoin Granite City from enforcing § 2(b) and § 2(c) permanently on the ground that the provisions were unconstitutional. In response, the City repeated that Ordinance No. 7861's restrictions were necessary "to assure the citizens of Granite City the desire to be free of unwanted intrusion, trespass, harassment, and litter," but yet again pointed to no evidence showing that handbilling caused those problems. Apparently concerned with the City's lack of proffered evidence justifying the Ordinance, Judge Reagan held a status conference during which he again asked the City whether it would introduce evidence showing that handbilling caused intrusion, trespass, harassment, or litter. The City, however, responded that it would not.

The district court granted Horina's motion for judgment on the pleadings, but went beyond the relief that he requested. The court did not permanently enjoin Granite City from enforcing only § 2(b) and § 2(c), as Horina requested; instead, the court permanently enjoined the City from enforcing Ordinance No. 7861 in its entirety. The court's expansive relief was based on its determination that the City failed to satisfy its burden of producing evidence showing that handbilling "constitutes or in any

way results in 'unwanted intrusion, trespass, harassment, [or] litter' " in the City. The court pointed out that the City failed to proffer any "empirical studies, testimony, police records, reported injuries, or anything else"; that the City did not "even *allege* that such evidence exists"; and that the City offered only " 'mere conjecture' " in an attempt to establish the Ordinance's justifications. And because the City could not show that the entire Ordinance served a substantial government interest, the court concluded, the Ordinance, as a whole, was an unreasonable restriction on the time, place, and manner in which individuals could handbill. Judge Reagan therefore declared the Ordinance unconstitutional on its face, and permanently enjoined the City from enforcing it.

Armed with the district court's judgment, Horina sought $5,000.00 in compensatory damages from Granite City to account for the "humiliation, emotional distress, and loss of First Amendment rights" that he endured due to the City's unconstitutional handbilling restrictions. The district court thus scheduled a bench trial solely on the issue of damages. Horina was the only witness to testify at the trial, but his testimony regarding the injuries he suffered was framed only in the most general terms and was often contradictory. For instance, Horina testified that, for about one year after his citation for trespass, he avoided the City altogether and suffered personal humiliation as a result. But Horina also admitted that he continued to distribute Gospel tracts in other cities, and that he eventually returned to the City to distribute his tracts once or twice a week. Horina further claimed that, because of the City's restrictions, he feared that he would be cited for distributing his tracts. Horina also acknowledged, however, that in earlier court proceedings related to his chal-

lenge to the City's ban on "indiscriminate" handbilling, the City's Chief of Police stated that Horina would not be cited for his activities, and that in response, Horina "felt that there was less of a chance of getting arrested." Indeed, Horina admitted, other than his trespass citation, he was not arrested for distributing his tracts, or even asked by City authorities to limit his activities. Horina also testified about the out-of-pocket expenses he incurred while challenging the City's restrictions. In particular, Horina stated that he appeared in court "six to eight times," and that during each of those trips he spent "[u]nder $10" for meals. However, Horina also stated that he had no receipts from those purchases, and provided no other information regarding his expenses related to his trips to court.

The district court issued a post-trial order, in which it awarded Horina $2,772.00 in compensatory damages. Specifically, the court awarded Horina $672.00 to account for his out-of-pocket expenses; that amount, the court stated, "should adequately cover approximately 8 court appearances (estimating one hour each at $25.00 per hour), round-trip travel of one hour per trip (again, at $25.00 per hour) mileage (480 miles at .40 per mile) and meals (eight at $10 each)." But the court also determined that Horina was not due the full $5,000.00 he requested for his "humiliation, emotional distress, and loss of First Amendment rights." In explaining the award, the court did not point to any particular portion of Horina's testimony detailing his injuries. Instead, the court stated that "the precise extent to which [Horina's] constitutional rights were chilled remains relatively unclear," and opined that "Horina has minimal evidence regarding his emotional distress and feelings of humiliation." Nevertheless, the court deemed what "minimal

evidence" Horina introduced still warranted an award of $2,100.00. Shortly thereafter, the court also calculated that Horina was due $62,702.02 in attorneys' fees and costs, and issued a separate order awarding Horina that amount. *See* 42 U.S.C. § 1988; Fed. R. Civ. P. 54(d)(1).

## II. ANALYSIS

Granite City makes three arguments on appeal. The City first contends that the district court incorrectly concluded that Ordinance No. 7861 is unconstitutional. The City further argues that the district court erroneously calculated the compensatory-damages award, and likewise incorrectly determined how much in attorneys' fees and costs Horina was due. We address each argument below.

### A. *The district court's determination that Ordinance No. 7861 is unconstitutional*

Before we address the merits of Granite City's challenge to the district court's decision striking down Ordinance No. 7861, we must first clarify this case's procedural posture. The City states that it appeals from the district court's grant of Horina's Rule 12(c) motion for judgment on the pleadings, an assertion with which Horina agrees. If the parties are correct, then we would review the district court's decision as we would a decision granting a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 623 (7th Cir. 2007); *Guise v. BWM Mortgage, LLC*, 377 F.3d 795, 798 (7th Cir. 2004). But in agreeing on this case's procedural posture, the parties ignore that the district court re-

peatedly asked the City to proffer evidence outside of its pleadings to show that handbilling caused litter, intrusion, trespass, and harassment. And in so seeking this additional evidence, the district court both treated Horina's Rule 12(c) motion as one for summary judgment, *see* Fed. R. Civ. P. 12(c)-(d); *Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 856 n.3 (7th Cir. 2007), and put the parties on notice that it would treat the motion as one for summary judgment, *see Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 684 (7th Cir. 1994) (stating that district court gives sufficient notice that it is treating Rule 12 motion as summary-judgment motion when "both parties had every reason to know that extraneous material was being considered"). We will thus review the district court's decision as if it granted Horina summary judgment—employing a *de novo* review, *see Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th Cir. 2008), we will view the record in the light most favorable to Granite City, the non-moving party, and will examine whether there is a genuine issue of material fact that precludes judgment as a matter of law, *see* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Cady v. Sheahan*, 467 F.3d 1057, 1060-61 (7th Cir. 2006).

Traditionally, "handbilling" has referred to the practice of offering written material—be it handbills, pamphlets, tracts, advertisements, booklets, notices or other information—to individuals in public places for their acceptance or rejection. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 809-10 (1984); *Schneider v. New Jersey*, 308 U.S. 147, 160-61 (1939). As the United States Supreme Court recognized nearly 70 years ago in the its decision *Lovell v. Griffin*, handbilling is both a method of communication that has a long and venerable history that

predates the birth of this nation, and is a form of speech that is protected under the First and Fourteenth Amendments. *See* 303 U.S. 444, 452 (1938) (noting that handbills have "been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest"); *see also Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943) ("The hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses."). And in the time since the Supreme Court decided *Lovell*, federal courts have invalidated bans on distributing literature on public streets, *see, e.g., United States v. Grace*, 461 U.S. 171, 183-84 (1983); *Schneider*, 308 U.S. at 163-64; *Weinberg*, 310 F.3d at 1036-40, restrictions on individuals' rights to engage in door-to-door handbilling, *see, e.g., Martin v. City of Struthers*, 319 U.S. 141, 149 (1943); *Watseka v. Ill. Public Action Council*, 796 F.2d 1547, 1558 (7th Cir. 1986), and licensing requirements for those who wished to distribute their handbills door-to-door, *see Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 168-69 (2002); *Lovell*, 303 U.S. at 451.

But as with all forms of protected speech, the right to handbill is not absolute, *see Taxpayers for Vincent*, 466 U.S. at 809-10, and federal courts have determined that governments may enact reasonable restrictions on handbilling that are also consistent with the First Amendment. Specifically, so long as the restrictions are "content neutral"—that is, unrelated to the content of the speech expressed in the handbills—governments may regulate the time, place, and manner in which the activity of handbilling itself occurs. *See Weinberg*, 310 F.3d at 1036-37. And under this "time, place, and manner analysis," such restrictions can survive scrutiny only if the govern-

ment can show that they (1) serve a substantial government interest; (2) are narrowly tailored to advance that interest; and (3) leave open ample alternative channels of communication to allow the individual handbilling other ways to convey his or her message. *See Ward*, 491 U.S. at 791; *Weinberg*, 310 F.3d at 1036-37.

Granite City, however, argues that the time, place, and manner analysis is an inappropriate method to assess the constitutionality of Ordinance No. 7861 as a whole, and that the district court was wrong to employ it. According to the City, not all of the Ordinance's provisions restrict handbilling as that practice has been traditionally understood—that is, distributing literature to individuals in a public place. As the City sees it, § 2(b) and § 2(c) instead restrict the practice of intruding on other individuals' private property—the windshields of privately owned automobiles and privately owned unoccupied buildings, respectively—to leave information without first affording individuals the opportunity to accept or reject it. This distinction is important, the City asserts, because private property is a nonpublic forum, meaning that any restriction of speech in that forum should be weighed under the "forum-based approach," and not the time, place, and manner analysis that the district court employed. And under the forum-based approach, regulations of speech in nonpublic fora are assessed only for reasonableness, *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983); *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 566 (7th Cir. 2001), a standard that, the City argues, § 2(b) and § 2(c) easily satisfy.

Granite City's argument raises interesting questions as to whether placing handbills on privately owned automobiles and unoccupied buildings are activities that

fall under the traditional definition of handbilling. But we need not address those questions here because the City's argument in support of the forum-based approach is fatally flawed. The forum-based approach applies only when a government restricts speech on property that the government itself owns. The validity of the restriction, in turn, depends on the type of government property—or "forum"—in which the speech occurs. *See Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992); *Perry Educ. Ass'n*, 460 U.S. at 45-46; *Gilles v. Blanchard*, 477 F.3d 466, 473-74 (7th Cir. 2007). And thus far, the Supreme Court has identified three publicly owned fora that guide this approach: traditional public fora (such as street corners, city squares, and city parks), fora designated for a particular use (such as a publicly owned amphitheater), and nonpublic fora (everything else publicly owned that is not a traditional public forum or a designated forum). *See Lee*, 505 U.S. at 678; *see also Gilles*, 477 F.3d at 473-74 (noting dubiously that circuit courts of appeals have "carved out a fourth category" of public fora, "the limited designated public forum").

In other words, the term "nonpublic forum" is not synonymous with privately owned property, as Granite City suggests. The designation merely signifies that the property in question is publicly owned, but is neither a traditional public forum, nor a designated public forum. *See Lee*, 505 U.S. at 678-79 (stating that nonpublic fora are "all remaining public property" other than traditional public fora and designated public fora); *Perry Educ. Ass'n*, 460 U.S. at 46 ("Public property which is not by tradition or designation a forum for public communication is governed by different standards."); *Gilles*, 477 F.3d at 474. The City is therefore wrong to assert that § 2(b) and § 2(c)

should be weighed under the forum-based approach solely because those provisions prohibit intrusion on other individuals' private property.

That said, Granite City does not otherwise challenge the district court's application of the time, place, and manner analysis. And because Ordinance No. 7861 is a content-neutral restriction, we see no reason to conclude that the district court was wrong to employ that analysis when assessing the Ordinance's constitutionality. *See Jobe v. City of Catlettsburg*, 409 F.3d 261, 267 (6th Cir. 2005) (concluding that public-forum doctrine does not apply to privately owned automobiles parked on city streets, and that restrictions on placing pamphlets on automobiles are assessed under time, place, and manner analysis); *Krantz v. City of Fort Smith*, 160 F.3d 1214, 1219 (8th Cir. 1998) (applying time, place, and manner analysis to assess prohibition of placing handbills on automobile windshields); *Watseka*, 796 F.2d at 1552-53 (applying time, place, and manner analysis to weigh ordinance regulating when individuals may engage in door-to-door soliciting).

The question thus becomes whether the district court correctly concluded that Ordinance No. 7861, in its entirety, is an unconstitutional time, place, and manner restriction on handbilling. Granite City argues "no," and challenges the court's conclusion that the City failed to proffer evidence showing that handbilling causes litter, intrusion, trespass, and harassment. Specifically, the City takes issue with the district court's determination that the City needed to present "empirical studies, testimony, police records, [or] reported injuries" showing that the Ordinance was justified. In Granite City's view, the district court overstated what evidence it needed to proffer when it was, in fact, under "no obligation" to present evidence "to

support the purposes of the Ordinance." Instead, the City argues, "common sense" shows that the Ordinance was needed to combat litter, intrusion, trespass, and harassment.

We have no quarrel with Granite City's claim that the prevention of litter, intrusion, trespass, and harassment is a substantial government interest. *See Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 164-65 (stating that prevention of crime and protecting residents' privacy are "important interests"); *Jobe*, 409 F.3d at 268 (determining that "litter and visual blight" and the protection of individual property rights are substantial government interests).

But we cannot accept Granite City's assertion that it can rely on mere common sense to show that Ordinance No. 7861 is needed to combat those ills. Although common sense does have its value when assessing the constitutionality of an ordinance or statute, *see Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006); *Weinberg*, 310 F.3d at 1042, it can all-too-easily be used to mask unsupported conjecture, which is, of course, *verboten* in the First Amendment context, *see Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000); *Weinberg*, 310 F.3d at 1030. That is why "the government has the burden of showing that there is evidence supporting its proffered justification" for its speech restriction when asserting that the restriction survives the time, place, and manner analysis. *Weinberg*, 310 F.3d at 1038; *see also DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 829 (7th Cir. 1999). In satisfying this burden, however, the government does not always need to produce a panoply of "empirical studies, testimony, police records, [or] reported injuries," as Judge Reagan put it; less evidence might be sufficient, of course, depending

on the scope and context of the restriction in question. *See DiMa Corp.*, 185 F.3d at 829 ("'The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'" (quoting *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 51 (1986)). But the government must nevertheless proffer *something* showing that the restriction actually serves a government interest, and we have struck down time, place, and manner restrictions where the government failed to produce "objective evidence" showing that the restrictions served the interests asserted. *See Weinberg*, 310 F.3d at 1039; *Watseka*, 796 F.2d at 1556.

Here, the experienced district judge correctly concluded that Granite City failed to proffer any evidence showing that handbilling caused litter, intrusion, trespass, or harassment in the City. The record reveals that the City introduced absolutely no evidence before the district court showing that Ordinance No. 7861 was needed to combat those problems. Even more, the City failed on several occasions to respond to Judge Reagan's requests for evidence supporting the Ordinance's justifications.

For its part, Granite City now points to what it deems to be proof that handbilling causes litter, intrusion, trespass, or harassment, but this late proffer fails to carry the day. Specifically, the City contends that the fact that Horina placed a Gospel tract in Lang's automobile against his wishes shows that Ordinance No. 7861 is needed to combat trespass. But this point hurts the City more than it helps. After all, for his indiscretion Horina was eventually cited with trespassing on Lang's car—a fact that creates the

distinct impression that a broad restriction on handbilling is not needed to combat trespass when the City already has enacted an ordinance that proscribes trespass, *see* Granite City, Ill., Municipal Code tit. IX, chs. 9.60.020, 9.63.010. *See also Ward*, 491 U.S. at 799 (stating that speech restriction can withstand scrutiny under time, place, and manner analysis only if government interest is "'achieved less effectively absent the regulation'" (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)); *Weinberg*, 310 F.3d at 1040 (same).

Equally meritless is the City's contention that the fact that "at least one state" and "38 other cities" have passed laws similar to Ordinance No. 7861 proves that handbilling causes litter, intrusion, trespass, or harassment. The fact that other states and cities have restrictions on handbilling says nothing about whether handbilling caused litter, intrusion, trespass, or harassment *in Granite City* to such an extent as to necessitate a handbilling restriction; nor does it alleviate the City's burden of producing evidence showing that the Ordinance is justified. *See Playtime Theaters, Inc.*, 475 U.S. at 51 (stating that evidence generated by other municipal governments must be relevant to the problem the municipal government in question is attempting to address); *DiMa Corp.*, 185 F.3d at 829 (same). But that aside, because the City points to no other evidence showing that handbilling causes those problems, we have no basis upon which to conclude that any of the Ordinance's provisions serve a substantial government interest.

But even if Granite City had proffered sufficient evidence establishing that Ordinance No. 7861 serves a substantial government interest, the City has not shown that the Ordinance satisfies the remaining two elements

of the time, place, and manner analysis. First, the Ordinance is not narrowly tailored. A restriction on handbilling is narrowly tailored if it "'promotes a substantial government interest that would be achieved less effectively absent the [restriction].'" *Weinberg*, 310 F.3d at 1040 (quoting *Ward*, 491 U.S. at 799). But the City has not explained to us how the prevention of litter, intrusion, trespass, or harassment is achieved less effectively without the Ordinance, and has thus waived the argument.[1] *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002). And even if the City had raised the point, it still would not have prevailed. As we alluded to earlier, the City already proscribes in some form litter, intrusion, trespass, or harassment, *see* Granite City, Ill., Municipal Code tit. VIII, ch. 8.64.020; Granite City, Ill.,

---

[1] This is a costly waiver indeed. Notwithstanding our discussion of Granite City's arguments up to this point, the City's failure to explain how the prevention of litter, intrusion, trespass, or harassment is achieved less effectively without Ordinance No. 7861 actually dooms its appeal. Without such an explanation, the City cannot establish that the Ordinance is narrowly tailored, which, in turn, means that the City cannot show that the Ordinance satisfies the time, place, and manner analysis, and thus survives constitutional scrutiny. *See Ward*, 491 U.S. at 791 (stating that under time, place, and manner analysis, speech restriction can survive constitutional scrutiny only if government can show that it (1) serves substantial government interest; (2) is narrowly tailored to advance that interest; *and* (3) leaves open ample alternative channels of communication to allow speaker other ways to convey his or her message). Nevertheless, for the sake of completeness, we will continue to explain why the Ordinance fails to satisfy the entire time, place, and manner analysis. *See Weinberg*, 310 F.3d at 1040.

Municipal Code tit. IX, chs. 9.24.020, 9.60.020, 9.63.010, leading us to believe that the City can currently combat those problems very effectively without resorting to a broad prohibition on handbilling, *Watseka*, 796 F.2d at 1556 (stating that solicitation ban is not narrowly tailored when "a city can enforce its trespass law against solicitors who enter or remain on private property after the owner has indicated the solicitor is not welcome"); *Wis. Action Coalition v. Kenosha*, 767 F.2d 1248, 1257 (7th Cir. 1985) (discussing less restrictive alternatives to speech regulations of which Supreme Court has approved); *see also Schneider*, 308 U.S. at 162-63 ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets. . . . [T]he public convenience in respect of cleanliness of the streets does not justify an exertion of the police power which invades the free communication of information and opinion secured by the Constitution.").

Likewise, Ordinance No. 7861 fails to leave open ample alternative channels of communication to allow individuals handbilling other ways to convey their message. Granite City argues that such alternative channels are available because, despite the Ordinance's specific proscriptions on handbilling, individuals may still (1) distribute handbills to people who wish to accept them, including the drivers of automobiles and the residents of homes; and (2) send their literature through the mail.

We disagree. An adequate alternative does not have to be the speaker's first or best choice, *see Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981); *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000), or one that provides the same audience or impact for the speech, *see*

*Ward*, 491 U.S. at 802. But the alternative must be more than "merely theoretically available"—"it must be realistic as well." *Gresham*, 225 F.3d at 906; *see also Linmark Assocs., Inc. v. Township of Willingboro*, 431 U.S. 85, 93 (1977). As such, we have "'shown special solicitude for forms of expression'" that involve less cost and more autonomy for the speaker than the potentially feasible alternatives. *Gresham,* 225 F.3d at 906 (quoting *Taxpayers for Vincent*, 466 U.S. 789, 812 n.30 (1984)); *see also Linmark Assocs., Inc.*, 431 U.S. at 93.

With this in mind, we believe that the alternative methods of communication forwarded by Granite City simply are not feasible. Forcing an individual to limit handbilling activities to person-to-person solicitation is extremely time consuming and burdensome, particularly when the individual intends to convey a message to people who park their automobiles in a certain area of the city or who live in a certain neighborhood. For instance, with § 2(b) and § 2(c) of Ordinance No. 7861 in effect, the individual would not be able to leave literature on the windshields of automobiles or the doorsteps of homes. Instead, the individual would be forced to distribute literature by hand to passersby, to people who are sitting in their parked automobiles when the individual happened upon them, or to people who are at home when the individual knocks on their front door. Because of these limitations, the time it would take the individual to convey the message to the intended audience would increase from perhaps under an hour to conceivably several days. And we cannot say that an alternative channel of communication is realistic when it requires a speaker significantly—and perhaps prohibitively—more time to reach the same audience. *See Gresham*, 225 F.3d at 906; *see also City of Ladue v. Gilleo*, 512

U.S. 43, 57 (1994) (concluding that proposed alternative channels of communication were unacceptable because of, among other things, the "added costs in money or time" the alternatives required).

Similarly, the fact that an individual could mail the literature is no alternative to handbilling. We have already rejected the notion that using the mail to disseminate literature provides a suitable alternative to handbilling, *see Watseka*, 796 F.2d at 1557-58, and we see no reason to depart from that determination here. After all, the mail system is both an expensive and unwieldily method for individuals to distribute handbills to their neighbors, *see Gresham*, 225 F.3d at 906; *Taxpayers for Vincent*, 466 U.S. at 812 n.30, and a completely ineffective method to distribute literature to people who have parked their automobiles nearby, *Weinberg*, 310 F.3d at 1040 ("[A]n alternative is not adequate if it 'forecloses a speaker's ability to reach one audience even if it allows the speaker to reach other groups.'" (quoting *Gresham*, 225 F.3d at 907)). We thus reject Granite City's contention that Ordinance No. 7861 allows individuals who seek to handbill ample alternative methods to convey their messages.

To recap, the district court was correct to strike down Ordinance No. 7861. Granite City proffered no evidence showing that the Ordinance is needed to combat litter, intrusion, trespass, or harassment. Moreover, the Ordinance neither is narrowly tailored to combat those problems, nor does it leave open ample alternative methods for those seeking to distribute literature to convey their message. As such, the Ordinance cannot survive constitutional scrutiny. *See Ward*, 491 U.S. at 791; *Weinberg*, 310 F.3d at 1036-37.

B.  *The district court's award of compensatory damages to Horina*

Granite City also argues that the district court's award of $2,772.00 in compensatory damages to Horina was improper. Specifically, the City contends that the district court's award of $672.00 for Horina's out-of-pocket expenses is not supported by the record. Instead, the City continues, the award was impermissibly based only on vague estimates of Horina's expenses. The City also argues that the district court's award of $2,100.00 for Horina's "humiliation, emotional distress, and loss of First Amendment rights" was not based on any evidence that Horina actually suffered those injuries. We review the district court's legal determinations *de novo* and its factual determinations for clear error. *See Alexander v. City of Milwaukee*, 474 F.3d 437, 448-49 (7th Cir. 2007).

We agree with the City that the district court's award of $672.00 is not supported by the record. When calculating compensatory damages, district courts may make a " 'just and reasonable estimate'" of the damages due, but those estimates must nevertheless be consistent with the evidence presented regarding damages. *Zazu Designs v. L'Oreal S.A.*, 979 F.2d 499, 506 (7th Cir. 1992) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)); *see also Sulzer Carbomedics v. Or. Cardio-Devices, Inc.*, 257 F.3d 449, 459-60 (5th Cir. 2001) (stating that district court "may not determine damages by 'speculation or guess'" (internal citation omitted)).

But here, the evidence relevant to the calculation of the award was lacking. The only evidence regarding Horina's out-of-pocket expenses was his guess that he spent "[u]nder $10" on meals on each of the "six or eight times" he traveled to court. And there was no evidence sup-

porting an award of $80.00 for Horina's meals, $400.00 for his time, or $192.00 for his mileage. *See Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1264 (10th Cir. 1995) ("Amounts that are speculative, remote, imaginary, or impossible of ascertainment are not recoverable." (internal quotation marks and citation omitted)). The district court thus erred in awarding Horina $672.00 for his out-of-pocket expenses. *See Zazu Designs*, 979 F.2d at 506; *see also United States v. Roman*, 121 F.3d 136, 140 (3d Cir. 1997) (stating that district court's factual findings are clearly erroneous if they are unsupported by substantial evidence, lack adequate evidentiary support, are against clear weight of the evidence, or if court has misapprehended weight of evidence).

The district court likewise erred when awarding Horina $2,100.00 for his "humiliation, emotional distress, and loss of First Amendment rights." Although a district court may award compensatory damages to a successful § 1983 plaintiff, it may not award damages to account for "the abstract value of a constitutional right." *Watseka*, 796 F.2d at 1558-59. Therefore, a district court may award the plaintiff damages only if he can prove that the denial of his constitutional rights resulted in an actual injury. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986); *see also Wateska*, 796 F.2d at 1558-59. The fact that the "monetary value of the particular injury is difficult to ascertain"—as is often the case when the injuries asserted are humiliation, distress, and other harms associated with the denial of a right—does not preclude an award of damages. *Wateska*, 796 F.2d at 1558-59; *see also Stachura*, 477 U.S. at 307; *Gilpin v. Am. Fed'n of State, County, and Mun. Employees, AFL-CIO*, 875 F.2d 1310, 1314 (7th Cir. 1989). But the plaintiff must nevertheless show that he

actually suffered those injuries, and "[w]here no injury [is] present, no 'compensatory' damages [may] be awarded." *Stachura*, 477 U.S. at 308; *see also Carey v. Piphus*, 435 U.S. 247, 264 (1978) (stating that "some actual, if intangible, injury must be proved before compensatory damages may be recovered").

However, we cannot tell whether Horina suffered any actual injury, much less the "humiliation, emotional distress, and loss of First Amendment rights" he contends to have suffered. Horina's testimony before the district court regarding the extent to which he was forced to curtail his handbilling was unclear at best and contradictory at worst, particularly when he admitted that he continued to distribute his Gospel tracts in other cities, and that he eventually resumed distributing his tracts in Granite City without incident.

Moreover, the fact that Horina resumed distributing his tracts in Granite City after a brief hiatus contradicts his assertion that he suffered humiliation "from having to conspicuously avoid being in Granite City for fear of being ticketed and/or arrested." And although Horina claimed that he endured emotional distress from distributing his tracts in fear, he also acknowledged that his fear subsided when the City's Chief of Police stated in court that he would not be cited for his activities. Based on this record, we are unable to determine whether Horina suffered "humiliation, emotional distress, and loss of First Amendment rights," nor can we ascertain whether $2,100.00 represented adequate compensation for those purported injuries. *See Watseka*, 796 F.2d at 1558-59 (affirming award of compensatory damages where plaintiff sufficiently explained the "non-abstract" harms and "specific injuries" it suffered from denial of First Amend-

ment rights). As such, the award of damages cannot stand. *See Everaard v. Hartford Accident & Indem. Co.*, 842 F.2d 1186, 1193 (10th Cir. 1988) (reversing award of compensatory damages where basis for award was unclear from both record and district court's decision).

On remand, Horina may be able to proffer something more than vague testimony to clarify the injuries he allegedly sustained. If not, the district court may be unable to award him anything but nominal damages. *See Carey*, 435 U.S. at 266 (stating that nominal damages are available to prevailing § 1983 plaintiff when no actual injury is proven).

## C. *The district court's award of attorneys' fees to Horina*

Granite City also challenges the district court's award of $62,702.02 in attorneys's fees and costs to Horina. But we need not address the point because both parties have agreed in their briefs that, if we were to reverse only the district court's judgment awarding compensatory damages, the amount awarded to Horina for attorneys' fees and costs should be reduced by the amount incurred in connection with the bench trial on the issue of damages— $19,080.00—so that Horina would be due $43,622.02. And because we have reversed only the district court's judgment awarding compensatory damages, we will allow the parties the benefit of their stipulation.

## III. CONCLUSION

We AFFIRM the district court's judgment that Ordinance No. 7861 is unconstitutional. However, we REVERSE the district court's judgment awarding $2,772.00 in compensa-

tory damages to Horina, and REMAND this case to allow the district court to revisit the issue of damages. Finally, consistent with the parties' stipulation on appeal, we ORDER the district court to reduce the attorneys' fees and costs due to Horina to $43,622.02.

MANION, *Circuit Judge*, concurring in part, dissenting in part. The Granite City Ordinance allows for the distribution of handbills[2] directly to people or to homes and businesses which are currently occupied. It prohibits the placing of handbills on parked vehicles and unoccupied private premises. Clearly the Ordinance regulates speech, but only the manner of speech. Thus, as the court concludes, the Ordinance is properly reviewed as a time, place, and manner regulation, and not a regulation of a forum. Accordingly, I concur with the court's well-reasoned conclusion that the Ordinance does not regulate a non-public forum. Rather, it requires a time, place and manner analysis of any restriction on speech. For the reasons explained below, I disagree with the court's determination that the Ordinance is unconstitutional and conclude that the Ordinance is a valid time, place and manner

---

[2] "The term 'handbill' includes any leaflet, pamphlet, brochure, notice, handout, circular, card, photograph, drawing or advertisement, printed on paper or on cardboard." Ordinance § 2(a).

regulation of speech. No further evidence from the City is needed to reach this conclusion. Because I believe the Ordinance is valid, I would overturn the damage award and award of attorneys' fees as well.

Section 2(b) of the Ordinance provides that "[n]o person shall deposit or throw any handbill in or upon any vehicle."[3] Horina wishes to place handbills "on automobiles that are parked on public places" and claims Section 2(b) is unconstitutional. Appellee Br. at 6. Because the Ordinance is a restriction on the manner of speech,[4] to survive constitutional scrutiny, the restriction must be content-neutral and the regulation must (1) serve a substantial governmental interest; (2) be narrowly tailored to advance that interest; and (3) leave open ample alternative channels of communication. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1036-37 (7th Cir. 2002).

It is undisputed that the Ordinance is content-neutral. The Ordinance also serves a substantial governmental interest. Specifically, as set out in the preamble, the Ordi-

---

[3] Section 2(b) does not restrict traditional leafletting, which, as the court notes, is the offering of written materials to individuals in public places for their acceptance or rejection. Opinion at 9. Rather, § 2(b) prohibits the leaving of handbills on automobiles; with an automobile, the driver is unknown and the receptacle is mobile and lacks the ability to accept or reject the handbill.

[4] The Ordinance does not regulate the time of speech. Nor does it regulate the place of speech. An automobile is not a place; it is chattel (movable personal property). The street or parking lot is a place, and that place is open to distribution when the automobile is present and even after it is driven away. Thus, only the manner of speech is regulated.

nance was enacted to protect the City's residents' "desire to be free from unwanted intrusion, trespass, harassment, and litter." The court concludes that "the prevention of litter, intrusion, trespass, and harassment is a substantial government interest that would justify a restriction on handbilling," Opinion at 14, but because "Granite City failed to proffer any evidence showing that handbilling caused litter, intrusion, trespass, or harassment in the City," the Ordinance is unconstitutional.[5] Opinion at 15. However, when evaluating the constitutionality of a statute, "common sense must not be and should not be suspended. . . ." *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006). Common sense dictates that the Ordinance serves the interests noted. It would be the rare driver indeed who has not experienced the intrusion of a flyer placed under a car windshield and the annoyance of removing the flyer, especially in inclement weather or when the driver doesn't notice it tucked under the passenger side windshield wiper until after fastening his seatbelt and starting his car. While the more thoughtful drivers dispose of such flyers properly, common sense tells us that at least some of the unwanted flyers become litter, even without evidence from the City.

Our sister circuit found common sense enough to establish the City's substantial governmental interest in

---

[5] Because the district court requested that the City provide evidence, the City could have provided a statement by a police officer, street cleaner, or other witness with first hand knowledge of what happens when flyers are placed on windshields of parked cars. That would have at least eliminated one reason for declaring the Ordinance unconstitutional. That, however, was not necessary in this case.

*Jobe v. City of Catlettsburg,* 409 F.3d 261 (6th Cir. 2005), which is directly on point. In *Jobe*, the plaintiff challenged the City of Catlettsburg's Ordinance which prohibited individuals from placing leaflets on vehicles. In analyzing this time, place and manner regulation, the Sixth Circuit stated that "the ordinance advances two significant government interests: (1) It furthers the government's interest in prohibiting litter and visual blight; and (2) it furthers individuals' interests in having their private property left alone by those who do not have permission to use it." *Id.* at 268. The court added: "Allowing individuals to decide for themselves how, when or whether their private property is used . . . as a container for an advertisement (e.g., placing a leaflet under the car windshield wipers) is a legitimate, if not compelling government interest." *Id.* Significantly, the Sixth Circuit then stated:

> Nor does Catlettsburg stand alone in seeking to advance these government interests. That at least one State (New York) and at least 38 other cities—from Philadelphia and Atlanta to San Antonio and Portland (Oregon) to Mishawaka (Indiana) and Albany (Georgia)—have passed similar laws suggests that the policy behind them is premised on legitimate rather than contrived police-power concerns. In view of the common-sense explanations for these types of laws, they do not invariably require proof that the problem has occurred in the past (a daunting task in view of the 1952 vintage of this law and the understandable absence of information about why the law was passed) or an elaborate study of their present-day necessity (an equally daunting task in view of the difficulty of showing the empirical necessity for a law

that has been in place for more than 50 years). While governments normally should be expected to weigh the costs and benefits of regulating methods of speech as well as the alternative to regulating speech at all before enacting such laws, it hardly amounts to speculation to conclude that the First Amendment costs of this law are quite modest (given the inexpensive alternatives available for distributing literature and advertisements) and the police-power benefits of the law are quite legitimate (given the private-property and aesthetic interests advanced by the law). Nor, at any rate, has [the plaintiff] presented any reason to question the city's theory that a ban on placing advertisements and posters on cars will further the city's interest in preventing littering on private property and in preventing the use of private property for purposes neither intended nor welcome by the owner.

*Id.* at 269 (internal citations and quotations omitted).

I would follow *Jobe* and hold that § 2(b) of the Ordinance serves a substantial governmental interest and that no specific evidence is needed to establish this conclusion. Moreover, even if some evidence were needed to confirm the common sense conclusion that the Ordinance addresses the need to prevent litter and to avoid unwanted intrusions on private property, we have such evidence in this case. Specifically, Nathan Lang testified during the first preliminary injunction hearing that he did not like literature placed under the windshield of his parked car, and that after Horina placed Gospel tracts on Lang's car on two separate occasions, Lang confronted Horina and asked him to stop placing the tracts on his car. When Horina ignored Lang's request and slid another Gospel tract through Lang's open window, the City charged

Horina with trespass. The court claims the City's reliance on Lang's testimony comes too late to carry the day. Opinion at 15. But Lang testified during the first preliminary injunction hearing *before* the district court granted Horina judgment on the pleadings, meaning that this evidence was before the district court. It is true that the City did not otherwise tee up this evidence for the district court, but that is not surprising because Lang had moved for judgment on the pleadings, and not summary judgment. If, as the court concludes, the district court may treat the motion as one for summary judgment because the court had asked for additional evidence, the district court should have considered all of the evidence already before it.

The court also reasons that since "Horina was eventually cited with trespassing on Lang's car," Lang's testimony "creates the distinct impression that a broad restriction on handbilling is not needed to combat trespass when the City already has enacted an ordinance that proscribes trespass." Opinion at 15-16. Contrary to the court's reasoning, though, Lang's testimony confirms the common-sense understanding of the need for such an Ordinance to prevent unwanted intrusion on private property. While Horina was cited for trespassing, that was only possible because Lang had previously witnessed Horina placing flyers on his (Lang's) car and had asked Horina to stop doing so. Significantly, Lang was also physically present at the time that Horina ignored his request and shoved a third tract into Lang's car. It was only because Lang was able to see Horina placing flyers on his car that Lang was able to ask him to stop, turning Horina's future behavior into a trespass. But Lang's testimony confirms that he did not like Horina leaving things on his car prior

to the conduct which resulted in a trespass citation. While a trespass ordinance can address the trespass, the City's handbill Ordinance addresses the leaving of pamphlets in cases where motorists are not present to object and identify the trespasser. (The flyer does not trespass, the person does.) Therefore, even if some evidence were needed to support the City's position that the Ordinance protects citizens' "desire to be free from unwanted intrusion, trespass, harassment, and litter," such evidence existed in the form of Lang's testimony.

I further conclude that § 2(b) is narrowly tailored to address the governmental interests at stake. As the Sixth Circuit concluded in *Jobe*, the ordinance "targeted the precise problems—littering on private automobiles and unauthorized use of private property—that it wished to correct." *Id.* at 270. So too here: The Granite City Ordinance regulates precisely the conduct that causes the litter and interferences with private property, namely the placing of flyers on automobiles. Given this direct nexus between the Ordinance and the governmental interest at stake, I conclude that Ordinance 2(b) is narrowly tailored.[6]

-------

[6] The court concludes that Granite City has waived the issue of whether the Ordinance is narrowly tailored. I disagree. Throughout this appeal, Granite City argued that the Ordinance is narrowly tailored to further substantial governmental interests. *See* Granite City Br. at 19-21. Granite City also explained why the trespass and anti-littering ordinances were insufficient to address the City's legitimate concerns. *See* Granite City Reply Br. at 11-12 ("Placing handbills on private vehicles effectively transfers the responsibility to dispose of the material (with the corresponding possibility of litter) to the recipient. Furthermore, trespassing and litter ordinances

(continued...)

Likewise, the Ordinance leaves open ample avenues of speech—specifically, handbills may be handed to pedestrians or motorists at the same time and same place, and also may be distributed at occupied homes and businesses. Again, I would follow the Sixth Circuit's well-reasoned opinion in *Jobe*:

> [T]he ordinance leaves open ample alternative channels of communication. Placed in the context of other municipal laws enacted by the city, the ordinance permits a wide range of leafletting activities. Catlettsburg does not prohibit leafletting in its most traditional sense-offering handbills to pedestrians and giving them the choice to take the handbill or leave it. It does not prohibit citizens from exercising their right to distribute literature in the same place where the ban on placing leaflets on car windshields exists-namely, by waiting in a parking lot or on a street and asking the owners of a car whether they would like a leaflet or a sign for their car. . . . It does not prohibit citizens from going door-to-door to talk to residents about the message they wish to share and expressly permits them to give homeowners a pamphlet if they are handed in at the door. It does not prohibit citizens from mailing information to residents. And it expressly

---

[6] (...continued)
would do little to resolve the problem of the blight associated with flyers or other materials being placed on every car on a public street or parking lot. . . [T]he situation involving Lang further establishes the need to protect vehicle owners from receiving materials that are neither requested nor wanted.") Accordingly, Granite City did not waive the argument that the Ordinance was narrowly tailored.

allows citizens to leave leaflets and pamphlets at private residences if they are "placed on a porch[ ] or securely fastened to prevent [them] from being blown or scattered about." By any measure of alternative channels of communication, the City of Catlettsburg has given its citizens numerous ways to distribute literature and information in an inexpensive, efficient and productive manner.

*Jobe*, 409 F.3d at 270.

Similarly, in this case, Granite City does not prohibit leafletting in the traditional sense of offering handbills to pedestrians. Likewise, Granite City does not prevent citizens from exercising their First Amendment rights at the exact same time and in the exact same place as where the ban of leafletting applies, by "waiting in a parking lot or on a street and approaching the pedestrians or motorists." *Id.* Citizens may go from door-to-door in Granite City to either talk to residents, hand them pamphlets, or leave them pamphlets, so long as the pamphlets are secure. As *Jobe* held, these are more than adequate alternatives to the leaving of handbills on automobiles, and afford Horina (and others) "numerous ways to distribute literature and information in an inexpensive, efficient and productive manner." *Id.*

The court also upholds the district court's conclusion that Section 2(c) of the Ordinance violates the First Amendment. Section 2(c) provides: "No person shall deposit, place, or throw any handbill upon any private premises which are temporarily or continuously unoccupied." Horina claims that § 2(c) violates his First Amendment rights because it prevents him from leaving information at houses where no one is currently at home, i.e., the residents are out to dinner, etc. The City responds that

"temporarily or continuously unoccupied" should be given its usual and customary meaning, which is "vacant house or building," and that a prohibition on leaving materials at vacant homes is a valid time, place, and manner restriction. Appellant's Reply Brief at 14-15. Reading the phrase "temporarily or continuously unoccupied" as "vacant" is consistent with the structure of the Ordinance, as a whole. Specifically, § 2(d) of the ordinance provides:

> [N]o person shall deposit or throw any handbill in or upon any private premises which are occupied, except by handing or transmitting any such handbill directly to the occupant or other person then present in or upon such private premises, or by placing or depositing such handbill so as to prevent it from being blown or drifted about such premises. . . .

Section 2(d) confirms that the City's position that "temporarily or continuously unoccupied" means vacant. Section 2(d) speaks of occupied homes as having residents who may be "then present," which indicates that the Ordinance recognizes that at other times, the residents will not be "present," yet the home will nonetheless be considered "occupied." Section 2(d) allows individuals to leave pamphlets at homes that are not vacant, so long as they are secured from blowing away. Given this limited reading of the Ordinance, I conclude that § 2(c) is also a valid time, place and manner restriction because it prevents litter which would result if materials were left at vacant homes.

Had § 2(c) prohibited the leaving of materials at homes that were not vacant, I would find the restriction unconstitutional, as homes are distinguishable from automobiles. As the court explained in *Jobe*, 409 F.3d at 272:

> In the setting of property that has a tradition of being used to receive and initiate communications, it may

> make abundant sense under the First Amendment to place the burden on the property owner to remove the slot on the door, to remove the mailbox, to sign onto a do-not-call or a do-not-spam list, or to place a "No Solicitation" sign on the door. It would make considerably less sense to put the vehicle owner to the choice of accepting either a ridiculous requirement (removing the windshield wipers) or an unorthodox burden (Placing a "No Handbills, No Posters. . ." sign on the dashboard).

I agree with *Jobe*'s rationale and likewise find the distinction between handbilling at homes and on cars significant. Accordingly, if § 2(c) were read to prohibit the leaving of handbills at occupied homes, I would join the court in its conclusion that such a restriction is unconstitutional.

   For these reasons, I would reverse the judgment of the district court declaring the Ordinance unconstitutional. Because I would reverse the district court's decision on the merits, I would also reverse the damage award and the award of attorney's fees.