**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2547**

AARON ROSS,

             Plaintiff – Appellant,

        v.

WAYNE A. EARLY; MAYOR AND CITY COUNCIL OF BALTIMORE;
BALTIMORE CITY POLICE DEPARTMENT,

             Defendants – Appellees,

        and

RONALD FARLEY; GEORGE NILSON, In His Individual Capacity and
Official Capacities as City Solicitor for the Mayor and City
Council of Baltimore; ELENA DIPIETRO, In Her Individual and
Official Capacities as Chief Solicitor for the Mayor and
City Council of Baltimore; LINDA BARCLAY, In Her Individual
Capacity as former Chief Solicitor for the Mayor and City
and City Council of Baltimore; FREDERICK H. BEALEFELD, III,
In His Individual Capacity and His Official Capacity as
Commissioner of the Baltimore City Police Department,

             Defendants.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   J. Frederick Motz, Senior District
Judge.  (1:09-cv-03255-JFM)

Argued:  October 29, 2013                Decided:  March 5, 2014

Before KEENAN, WYNN, and THACKER, Circuit Judges.

1

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge Keenan joined.  Judge Wynn wrote a dissenting opinion.

———————————

**ARGUED**: Sean Robert Day, LAW OFFICE OF SEAN R. DAY, Greenbelt, Maryland, for Appellant.  Barron Stroud, Jr., STROUD & PRIEST, LLC, Baltimore, Maryland; Steven John Potter, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees.  **ON BRIEF**: George Nilson, Glenn T. Marrow, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees Mayor and City Council of Baltimore and Baltimore City Police Department.

———————————

THACKER, Circuit Judge:

Appellant Aaron Ross ("Appellant") brought this action challenging his March 12, 2008 and March 25, 2009 arrests for refusing to obey Baltimore City Police Officer Wayne Early's ("Officer Early") repeated orders to confine his leafleting to the area designated for protest activities outside the First Mariner Arena (the "Arena") in Baltimore, Maryland. The designated protest area was defined by a written policy (the "Policy") of the Mayor and City Council of Baltimore (collectively, the "City") and the Baltimore City Police Department ("BCPD"). Appellant claims the Policy is facially unconstitutional as an invalid time, place, and manner restriction on First Amendment activity, and that Officer Early violated his state and federal rights. The district court granted summary judgment against Appellant on all claims. We hold, as did the district court, that the Policy is facially valid under the First Amendment as a reasonable time, place, and manner restriction, and we find no reversible error as to Appellant's remaining claims. Accordingly, we affirm.

I.

A.

The Arena is a large sports and entertainment venue located in downtown Baltimore. Due to its central location and the thirteen Mass Transit Administration ("MTA") bus routes that

3

discharge passengers in the area, the sidewalks and streets adjacent to the Arena, i.e., West Baltimore Street, Hopkins Place, West Lombard Street, and South Howard Street, regularly experience heavy pedestrian and automotive traffic. This is particularly so between 6:30 and 7:30 p.m. on weekdays, when approximately 50 MTA buses make stops on the surrounding streets.

Once a year, the City leases the Arena to Feld Entertainment for performances of the Ringling Brothers Barnum and Bailey Circus (the "Circus"). These performances, ordinarily held in late March, attract large crowds. Between seven and ten thousand patrons attend the 7:30 p.m. weekday shows, and putative attendees begin to gather outside of the Arena's main entrance, located on the corner of West Baltimore Street and Hopkins Place, at 6:00 p.m. The performances also draw a number of animal welfare activists, such as Appellant, who object to the Circus's treatment of animals. During the Circus's run, these annual demonstrators engage in various protest activities, including sign-holding, chanting, and leafleting, on the sidewalks contiguous to the Arena. Prior to

4

2004, the City had no official policy restricting the demonstrators' access to the relevant streets.[1]

On March 12, 2003, the City, on the recommendation of Linda Barclay ("Barclay"), then Chief of the Legal Counsel Division in the City's Law Department, issued a permit to People for the Ethical Treatment of Animals ("PETA") to park a media truck on the West Baltimore side of the Arena prior to that night's Circus performance. Although PETA complied with the terms of its permit, the position of the truck seriously obstructed the flow of traffic and caused several MTA buses to double park. Bus passengers and circus patrons overflowed from the sidewalk into the street, and BCPD and MTA officers were called to the scene to sort out the stalled traffic pattern and disperse the crowd.

Subsequent to this incident, Officer Early and at least one other BCPD officer sought advice from Barclay as to constitutionally permissible ways for BCPD to manage the potential disruption to pedestrian and automotive traffic caused by protesters during Circus performances. In response to this request, on March 10, 2004, Barclay issued the Policy, an e-mail

---

[1] On March 13, 2003, Peter Saar, then acting Chief Legal Counsel for the BCPD, advised Officer Early that "the entire sidewalk" was available for demonstrators. J.A. 166. Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

to various City and BPCD personnel, setting forth certain limitations on the location of sidewalk demonstrators prior to Circus performances.[2]  Noting the implementation of this plan had "worked well," the Law Department has since reissued the Policy by e-mail, with minor revisions, for each year of the Circus.  J.A. 197-199.  As last revised in 2006, the Policy provides:

> 1.  East Side of the Arena (Hopkins Place) – Any protestors will be asked to move to the sidewalk between the Arena and Hopkins Place.  This will help alleviate any congestion problems at the main entrance.[3]
>
> 2.  North Side of the Arena ([West] Baltimore Street) – Any protestors will be directed to stay within the brick area of the sidewalk, approximately 13 feet wide between the curb and the middle of the sidewalk.  This provides the remainder closer to the building for foot traffic to access Baltimore Street and main entrances.
>
> 3.  West Side of Arena (Howard Street) – Any protestors will be asked to remain on the corner of Howard and Baltimore Streets or to move to the middle of the block south of the Howard Street entrance.  This will allow sufficient room for attendees to access the Arena from the Howard Street entrance.

Id.  The Policy further directs police officers to issue at least two verbal warnings prior to making any arrest for failure to obey a lawful order.  See id.; see also Md. Code Ann., Crim.

---

[2] The parties have stipulated that the e-mails "constitute[] a policy of the Mayor and City Council of Baltimore and the Baltimore City Police Department[.]"  J.A. 156.

[3] Feld Entertainment parks large trailers on the Hopkins Place plaza during the pendency of the Circus.  See J.A. 214, 240.

6

Law § 10-201(c)(3) (a person who "willfully fail[s] to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace" is guilty of a misdemeanor).

On March 12, 2008, and March 25, 2009, Appellant was leafleting within the prohibited area outside the Arena's West Baltimore Street entrance. On each occasion, Officer Early repeatedly warned Appellant to move to the designated area and, when he refused, arrested him for failing to obey a lawful order. Appellant subsequently filed suit, alleging common law and constitutional torts against Officer Early as well as claims pursuant to 42 U.S.C. § 1983 against the City, BCPD, and other government officials for violating his First and Fourth Amendment rights.

B.

The lengthy procedural history of this case is thoroughly discussed in the district court's two published opinions, Ross v. Early, 758 F. Supp. 2d 313 (D. Md. 2010) ("Ross I") and Ross v. Early, 899 F. Supp. 2d 415 (D. Md. 2012) ("Ross II"), and we limit ourselves to summarizing the relevant portions of the orders currently on appeal.

On December 8, 2010, the district court denied the parties' cross-motions for summary judgment on Appellant's facial challenge to the Policy. See Ross I, 758 F. Supp. 2d at

7

319-25. Specifically, the court determined the level of scrutiny applicable to the Policy turned on a disputed question of material fact, i.e., whether the Policy "was of general application," like an ordinance, or "specifically targeted to circus and animal welfare protestors," like an injunction. Id. at 323. The court reasoned that, if the Policy was an ordinance-like restriction on speech, intermediate scrutiny would apply and the Policy would be upheld. Id. at 323-25; see Ward v. Rock Against Racism, 491 U.S. 781, 798-99 (1989) (for purposes of intermediate scrutiny, a time, place, and manner restriction on speech is narrowly tailored "'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation,'" and it need not be "the least restrictive or least intrusive means" of serving the government's significant interests (citation omitted)). If, however, the Policy was an injunction-like restriction on speech, heightened scrutiny would apply and the Policy would fail. Ross I, 758 F. Supp. 2d at 323-25; see Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994) (for purposes of heightened scrutiny, a time, place, and manner restriction in the form of an injunction is only narrowly tailored if "the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest"). The ultimate resolution of this question, the court

8

ruled, was a matter for the jury.  Ross I, 758 F. Supp. 2d at 323.

Thereafter, on September 25, 2012, the court granted Officer Early's motion for summary judgment as to the claims against him in his individual capacity.  See Ross II, 899 F. Supp. 2d at 425-32.  With respect to Appellant's claims that Officer Early violated his First and Fourth Amendment rights under 42 U.S.C. § 1983, the court concluded that, irrespective of the Policy's constitutionality, Officer Early was entitled to qualified immunity because he had not violated any of Appellant's "clearly established" constitutional rights.  Id. at 428-29.  As for Appellant's state law claims for false arrest and false imprisonment, the court concluded that Appellant had failed to demonstrate the absence of legal justification for his arrest and detention, a necessary predicate for sustaining such claims.  Id. at 430-31.

Faced with an imminent jury trial that would determine the level of scrutiny applicable to the Policy, the parties entered into a stipulation agreeing the Policy "was generally applicable toward all expressive activity" and "was not targeted . . . toward restricting the activities of circus and animal welfare street protesters specifically."  J.A. 156.  With the only remaining factual dispute thus resolved, the district court, consistent with its prior orders, determined that

9

intermediate scrutiny was the proper standard against which to measure Appellant's facial challenge. It thus entered judgment in favor of the City and BCPD, upholding the Policy as a reasonable time, place, and manner restriction on protected speech. See id. at 58.

On appeal, Appellant accepts intermediate scrutiny as the applicable standard of review and challenges only the district court's determination that, under that standard, the Policy is facially constitutional as a reasonable time, place, and manner restriction on speech. He further challenges the district court's grant of qualified immunity to Officer Early and its dismissal of his state law claims in Ross II.

## II.

We review a district court order granting summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. See Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC, 713 F.3d 187, 195 (4th Cir. 2013). The City bears the burden of showing the Policy satisfies the applicable level of scrutiny. See Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989).

## III.

We first address Appellant's facial challenge to the Policy as an improper time, place, and manner restriction on

10

protected speech. Applying intermediate scrutiny, we conclude the Policy is facially valid under the First Amendment.

A.

We apply the time, place, and manner doctrine to determine whether restrictions placed on protected speech in public fora violate the First Amendment. See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Clatterbuck v. City of Charlottesville, 708 F.3d 549, 555 (4th Cir. 2013). Here, it is undisputed that the Policy regulates protected speech, applies to public sidewalks that serve as traditional public fora, and is content-neutral in that it may be "justified without reference to the content of the regulated speech." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984). Consequently, the Policy will be upheld if it is "'narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information.'" Ward, 491 U.S. at 791 (quoting Clark, 468 U.S. at 293).

Before undertaking this analysis, however, we must determine the appropriate scope of our narrow tailoring inquiry. Our dissenting colleague would reject the intermediate standard articulated in Ward in favor of the heightened requirements set forth in Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994). We look to both Ward and Madsen to guide our inquiry.

11

Under Ward and its progeny, a content-neutral regulation directed at the time, place, or manner of protected speech is ordinarily subject to intermediate scrutiny. See Ward, 491 U.S. at 791. A regulation is narrowly tailored under this standard if it "'promotes a substantial government interest that would be achieved less effectively absent the regulation'" and does not "burden substantially more speech than is necessary to further the government's legitimate interests." Id. at 799 (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)). In this vein, the regulation need not be "the least restrictive or least intrusive means" of serving the government's significant interests. Id. at 798-99.

Where such a regulation takes the form of a court-issued injunction, however, the Supreme Court has determined that the "standard time, place, and manner analysis" set forth in Ward "is not sufficiently rigorous." Madsen, 512 U.S. at 765. Noting that "generally applicable statute[s]" are inexorably analyzed under Ward, the Court identified three "obvious differences" between ordinances and court-ordered injunctions that, in its view, compelled a heightened tailoring standard for the latter. 512 U.S. at 764. First, "[o]rdinances represent a legislative choice regarding the promotion of particular societal interests," while injunctions "are remedies imposed for violations (or threatened violations) of a

12

legislative or judicial decree." Id. at 764 (citation omitted). Second, injunctions bind only the parties in a particular case, not the public at large, and thus "carry greater risks of censorship and discriminatory application than do general ordinances." Id. Third, injunctions are only warranted when the party to be enjoined has engaged or threatened to engage in impermissible activity, and as such, injunctions "can be tailored by a trial judge to afford more precise relief than a statute[.]" Id. at 765 (citation omitted). These differences, the Court reasoned, call for a "somewhat more stringent" application of the narrow tailoring test in the injunction context. Id. It thus adopted a heightened scrutiny standard, requiring that "the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." Id. (citation omitted).

In the dissent's view, Ward and Madsen present a binary choice that must be resolved at the forefront of any litigation involving restrictions that are neither generally applicable statutes nor injunctions. The reviewing court, in other words, is charged with "conduct[ing] a fact-intensive inquiry to determine whether the restriction is more like an ordinance or more like an injunction" prior to selecting the appropriate level of scrutiny. Post at 8-9. Extrapolating from this principle, the dissent posits that the Policy more closely

13

resembles an injunction than an ordinance because it (1) involved no legislative choice and (2) is not publicly available. See id. at 13-14. Thus, the dissent concludes, heightened scrutiny must apply.

The dissent's threshold premise, although well-reasoned, stands on uncertain legal ground. Our court has not yet expanded Madsen's rationale beyond the borders of court-issued injunctions. Indeed, the Third Circuit is, to date, the only appellate court to have explicitly done so. See McTernan v. City of York, 564 F.3d 636, 654–55 (3d Cir. 2009) (applying heightened scrutiny to a targeted and ad hoc "police directive, issued by officers in the field"); see also Huminski v. Corsones, 386 F.3d 116, 155 (2d Cir. 2004) (citing Madsen with approval in analyzing the reasonableness of a targeted government restriction, issued by court security personnel to a single protester, in a nonpublic forum). In contrast, the overwhelming majority of our sister circuits have, post-Madsen, simply continued to analyze a wide variety of non-legislative governmental action, neither ordinance nor injunction, under intermediate scrutiny. See, e.g., Marcavage v. City of N.Y., 689 F.3d 98, 101, 106 (2d Cir. 2012) (policy instituted by police); Milestone v. City of Monroe, Wis., 665 F.3d 774, 782-84 (7th Cir. 2011) (city policy in the form of a senior center's code of conduct); Marcavage v. City of Chicago, 659 F.3d 626,

14

630-31 (7th Cir. 2011) (ad hoc oral police directives issued by officers in the field); Saieg v. City of Dearborn, 641 F.3d 727, 730-31, 738-39 (6th Cir. 2011) (policy instituted by police); Faustin v. City and Cnty. of Denver, Colo., 423 F.3d 1192, 1196-97, 1200-01 (10th Cir. 2005) (unwritten city policy); Menotti v. City of Seattle, 409 F.3d 1113, 1124-25, 1131-37 (9th Cir. 2005) (executive order issued during civil emergency); Hobbs v. County of Westchester, 397 F.3d 133, 148-50 (2d Cir. 2005) (county policy in the form of an executive order); Potts v. City of Lafayette, Ind., 121 F.3d 1106, 1109, 1111-12 (7th Cir. 1997) ("operations order" drafted by police captain); Int'l Caucus of Labor Comms. v. City of Montgomery, 111 F.3d 1548, 1150, 1151-52 (11th Cir. 1997) (city policy "in the form of a letter from the City Attorney").

The dissent distinguishes these cases on the grounds that they involve "legislative delegation[s] of policymaking authority," "one-of-a-kind security situation[s]," or "obvious actual notice of the speech restriction." Post at 14-15. The import of these purported distinctions is less than clear. Regardless of how these cases are categorized, they demonstrate that Madsen has rarely come into play outside of the injunction context, even in the limited universe of non-legislative actions. Indeed, to the extent these distinctions are even relevant, we observe that the instant case falls squarely within

15

the dissent's "obvious and actual notice" category –– in addition to the fact that the Policy has been publicly enforced since 2004, the videos of Appellant's arrests demonstrate that the police officers repeatedly advised the protestors (1) where they were permitted to demonstrate; (2) that the City had a "law" proscribing expressive activities to certain defined areas; and (3) that they should call the Law Department if they wanted more information. Cf. Faustin, 423 F.3d at 1195 (police officers asked protestor to leave and/or remove her banner pursuant to unwritten city policy); Int'l Caucus of Labor Comms., 111 F.3d at 1549 (police officers repeatedly ordered a group to cease distributing literature from tables, the group wrote a letter to the city, and the city replied by detailing its unwritten policy banning such tables); Potts, 121 F.3d at 1997 (policy banning "weapons" posted on signs at rally entry point).

In any event, we need not definitely resolve this issue for the purposes of this appeal. Critically, the parties have stipulated that the Policy is "generally applicable" and not "targeted . . . toward restricting the activities of circus and animal welfare street protestors specifically." J.A. 156. As set forth in detail by the district court, the injunction-specific concerns warranting heightened scrutiny identified in Madsen are largely inapposite in the context of generally

16

applicable municipal policies. See, e.g., Madsen, 512 U.S. at 764 ("'[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.'" (quoting Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 112–13 (1949))). Consequently, even if we were to accept the dissent's initial premise, we would nonetheless conclude the Policy is not subject to heightened scrutiny.

Although we share the dissent's concerns with respect to the Policy's non-legislative origins, we do not find these concerns to be dispositive. The Policy may not represent "a legislative choice," Madsen, 512 U.S. at 764, but this fact, standing alone, does not create an injunction-like restriction on speech. See, e.g., ante at 14-15. Similarly, the remainder of the dissent's concerns –- the procedures surrounding the Policy's promulgation and distribution, its allegedly "secret" nature –- are more like bygone due process and vagueness challenges than reasons to apply heightened scrutiny. We should not rush to declare a new rule of constitutional law simply

17

because we would have preferred that Appellant plead a different case.[4]

In short, the parties have stipulated to a set of facts warranting the application of intermediate scrutiny, and it is under that rubric we proceed. We must thus determine whether, under the principles set forth in Ward, the Policy is "'narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information.'" 491 U.S. at 791 (quoting Clark, 468 U.S. at 293).

1.

We begin by addressing whether the Policy is "'narrowly tailored to serve a significant governmental interest[.]'" Ward, 491 U.S. at 791 (quoting Clark, 468 U.S. at 293). A regulation is narrowly tailored if it (a) "'promotes a substantial government interest that would be achieved less effectively absent the regulation,'" and (b) does not "burden substantially more speech than is necessary to further the

---

[4] For similar reasons, the dissent's concern that our ruling will provide municipal governments with the incentive to "develop and enforce speech-restrictive 'Policies' without having to provide even a whisper of advance notice" is overblown -- the promulgation of such policies would be subject to the same due process and vagueness challenges that Appellant could have, but did not, raise here. Post at 16.

18

government's legitimate interests." Id. at 799 (citation omitted). We consider each of these elements in turn.

a.

In order to meet its burden under the first prong of the narrow tailoring requirement, the City must demonstrate that the Policy "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Ward, 491 U.S. at 799 (citation omitted). The City's express purpose in creating the Policy was to reasonably accommodate both circus protesters and circus attendees while ensuring protesters "(a) do not block pedestrian movement; (b) do not block entrances, exits or handicapped ramps; and (c) do not otherwise create a public safety hazard." J.A. 167.

Our jurisprudence makes clear that a city's interest "'in maintaining the safety, order, and accessibility of its streets and sidewalks'" is sufficient to justify a time, place, and manner regulation. Green v. City Of Raleigh, 523 F.3d 293, 301 (4th Cir. 2008) (quoting Cox v. City of Charleston, 416 F.3d 281, 284 (4th Cir. 2005)). Indeed, as described by the Supreme Court, "municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for the movement of people and property, the primary purpose to which the streets are dedicated." Schneider v. State of N.J., 308 U.S. 147, 160 (1939). On this strength of authority, we

19

have little trouble concluding the City's asserted interest in maintaining the flow of pedestrian traffic and ensuring public safety qualifies as "substantial."

This conclusion does not end our inquiry, however, as it is not enough for the City to identify an interest that is significant in the abstract. See Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994) ("That the Government's asserted interests are important in the abstract does not mean, however, that the [challenged law] will in fact advance those interests.").[5]  Rather, the City must demonstrate the Policy "materially advances an important or substantial interest by redressing past harms or preventing future ones."  Satellite Broad. & Commc'ns Ass'n v. FCC, 275 F.3d 337, 356 (4th Cir. 2001).  Although we do not require the government to present a panoply of empirical evidence in order to satisfy this standard, cf. United States v. Carter, 669 F.3d 411, 418 (4th Cir. 2012) ("[T]he Constitution does not mandate a specific method by which the government must satisfy its burden under heightened judicial scrutiny."), it must nonetheless make some evidentiary showing

---

[5] Although Turner involved expressive conduct evaluated under the test set forth in United States v. O'Brien, 391 U.S. 367, 377 (1968), we have recognized "the O'Brien test is 'little, if any, different from the standard applied to time, place, or manner restrictions.'"  American Legion Post 7 of Durham, N.C. v. City of Durham, 239 F.3d 601, 609 n.9 (4th Cir. 2001) (quoting Clark, 468 U.S. at 298).

20

that the recited harms are "'real, not merely conjectural,'" and that the Policy "'alleviate[s] these harms in a direct and material way.'" Satellite Broad., 275 F.3d at 356 (quoting Turner, 512 U.S. at 664); see also Marcavage, 689 F.3d at 105 (where the government interest involves reducing a risk to public safety, it must show "the risk . . . is substantial and real instead of merely symbolic" (internal quotation marks and citation omitted)).

With these principles in mind, we are satisfied the City has adequately demonstrated that the presence of protestors on the relevant sidewalks presents a plausible threat to the orderly flow of pedestrian traffic and, concomitantly, public safety. In reaching this conclusion, we emphasize that the City is "entitled to advance its interests by arguments based on appeals to common sense and logic," Multimedia Publ'g Co. of S. Carolina, Inc. v. Greenville-Spartanburg Airport, 991 F.2d 154, 160 (4th Cir. 1993), particularly where, as here, the burden on speech is relatively small. See Bl(a)ck Tea Soc'y v. City Of Boston, 378 F.3d 8, 14 (1st Cir. 2004) ("[H]eavier burdens on speech must, in general, be justified by more cogent evidentiary predicates.").

The undisputed evidence reveals that the sidewalks surrounding the Arena suffer from severe congestion during performances of the Circus and that, at least once -- in the

21

year preceding the issuance of the Policy -- the presence of protestors caused a significant safety hazard. Inasmuch as the Policy carves out a passageway dedicated to pedestrian movement, it materially reduces the risks the City intends to prevent. The Policy thus promotes the City's significant interest in a manner "'that would be achieved less effectively absent the regulation.'" <u>Ward</u>, 491 U.S. at 799 (citation omitted).[6]

b.

Next, we must ask whether the Policy "burden[s] substantially more speech than is necessary to further the government's legitimate interests." <u>Ward</u>, 491 U.S. at 799. To satisfy this standard, the City need not regulate using "the least restrictive or least intrusive means" available to achieve its goals. <u>Id.</u> at 798. Put differently, "[s]o long as the means chosen are not substantially broader than necessary to

---

[6] Appellant devotes much of his brief to the argument that the City's interest is illusory because "there is nothing in the record to suggest that they were remedying an actual threat <u>leafletting</u> [sic] poses to a significant government interest." Appellant's Br. 28 (emphasis supplied). Appellant misapprehends the applicable standard. The interest served by the Policy must be judged "on the relation it bears to the <u>overall problem</u> the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." <u>Ward</u>, 491 U.S. at 801 (emphasis supplied); <u>see also</u> <u>Albertini</u>, 472 U.S. at 688 ("The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests.").

achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Id. at 800.

The Policy restricts the protestors to three designated areas adjacent to the Arena, i.e., the outer half of West Baltimore Street's 29-foot sidewalk, a designated portion of Howard Street's 15-foot sidewalk, and the sidewalk directly across from the Hopkins Place plaza. The Policy is limited in both scope and duration, setting aside dedicated channels for pedestrian traffic on the relevant streets in order to promote the safety, order, and accessibility of its sidewalks during the pendency of a heavily attended event. On its face, the Policy does no more than "target[] and eliminate[] . . . the exact source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485 (1988) (citation omitted).

Appellant nonetheless contends the Policy is not narrowly tailored because a number of "obvious" and "feasible" alternatives exist that would permit more speech. Appellant's Br. 36; see City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 418 n.13 (1993) ("numerous and obvious less-burdensome alternatives" are "a relevant consideration in determining whether the 'fit' between ends and means is reasonable"). He presents a lengthy list of proposed alternatives, ranging from

23

"leaving things be" to implementing a system of "pro-rated" leafleting slots for individual protestors. Appellant's Br. 36. Many of Appellant's suggestions are vague and would require significant effort in implementation and enforcement -- the "obviousness" and "feasibility" of such alternatives is subject to debate. In any event, even if such alternatives are plausible, they do not alter our conclusion that the Policy does not burden substantially more speech than necessary. See Ward, 491 U.S. at 797 ("[R]estrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." (internal quotation marks and citation omitted)).

Appellant also posits the theory that the Policy is required to have a "small group exception" exempting a small number of persons, presumably leafleters, from its purview. Appellant's Rep. Br. 9. In support of this bold assertion, he relies on Cox, in which we held the lack of a small group exception rendered unconstitutional a city's policy requiring a permit for any gathering on public streets or sidewalks. 416 F.3d at 285-86. Inasmuch as Cox involved an exceedingly broad prior restraint, burdened by a "heavy presumption against its constitutional validity," Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963), it has limited applicability to this case. Indeed, in striking down the permit requirement as facially

24

unconstitutional for lack of a "small group" exception, Cox went on to identify a number of less restrictive means to achieve the city's objective -- including "ordinances that 'regulate only the volume, location, or duration of [protected] expression,' rather than subjecting all speech to a permit requirement." 416 F.3d at 286 (citation omitted). Faced with such clearly distinguishable authority, we can find no basis for importing the "small group" exception into the standard time, place, and manner context.

For all these reasons, we conclude the Policy's limited proscription on the locale of expressive activities is narrowly tailored to address threats to sidewalk congestion and public safety.

c.

We close our narrow tailoring discussion by addressing a concern raised by the dissent. In its view, we have neglected to address an essential element of the narrow tailoring inquiry, i.e., "whether the restriction operates 'in such a manner that a substantial portion of the burden on speech does not serve to advance [the government's] goals.'" Post at 17 (alteration in original) (quoting Ward, 491 U.S. at 799). Measuring the Policy against this test, the dissent contends, reveals it to be fatally underinclusive because the "secret nature of the restrictions" undermines the City's goals. Id. at 19.

25

The dissent derives its test for underinclusiveness from the following passage in Ward:

> To be sure, th[e] [narrow tailoring] standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

Ward, 491 U.S. at 799–800 (emphasis supplied) (internal citations and footnote omitted); see also post at 17.[7] The emphasized passage bears no obvious relationship to the concept of underinclusiveness. More to the point, we are aware of no authority, and the dissent has cited none, that supports its particular iteration of the narrow tailoring test. See post at 17.

We recognize, in any event, that the limited scope of a regulation on speech, i.e., underinclusiveness, can serve to

---

[7] Notably, the dissent agrees with our conclusion that the Policy does not "burden substantially more speech than is necessary to further the government's legitimate interests." Post at 18. It is difficult to reconcile how a regulation can "burden [no] more speech than necessary" to further its goals while simultaneously "regulat[ing] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Id.

26

"'undermine[] the likelihood of a genuine [governmental] interest[.]'" F.C.C. v. League of Women Voters of California, 468 U.S. 364, 396 (1984) (second alteration in original) (citation omitted). The dissent, however, has identified no such infirmity here. The crux of its theory is simply that the "secret" nature of the policy renders it constitutionally infirm. This is, in essence, a challenge to the Policy on vagueness grounds -- a challenge Appellant has not made. We will not, as the dissent urges, shoehorn a wholly undeveloped and unargued vagueness claim into this case under the guise of narrow tailoring.[8]

2.

The final prong of the time, place, and manner test asks whether the Policy "'leave[s] open ample alternative channels for communication of the information.'" Ward, 491 U.S.

---

[8] The fact that a few confused or disgruntled protestors actually caused some amount of pedestrian congestion by questioning the origin of the Policy does not, in any case, render the City's rationale "a challenge to the credulous." Republican Party of Minn. v. White, 536 U.S. 765, 780 (2002); see, e.g., Nat'l Ass'n of Mfrs. v. Taylor, 582 F.3d 1, 17 (D.C. Cir. 2009) ("'Because the primary purpose of underinclusiveness analysis is simply to ensure that the proffered state interest actually underlies the law, a rule is struck for under inclusiveness only if it cannot fairly be said to advance any genuinely substantial governmental interest, because it provides only ineffective or remote support for the asserted goals, or limited incremental support.'" (emphasis in original) (quoting Blount v. SEC, 61 F.3d 938, 946 (D.C. Cir. 1995))).

at 791 (quoting Clark, 468 U.S. at 293). In order to satisfy this standard, the available alternatives need not "be the speaker's first or best choice" or "provide[] the same audience or impact for the speech." Gresham v. Peterson, 225 F.3d 899, 906 (7th Cir. 2000) (citations omitted). Rather, the relevant inquiry is simply whether the challenged regulation "provides avenues for 'the more general dissemination of a message.'" Green, 523 F.3d at 305 (quoting Frisby, 487 U.S. at 482-84).

The Policy directs protestors to stand in designated areas located mere feet from their intended audience, within full view and earshot of both passersby and circus attendees, and imposes no restriction on the channels of expression employed therein. We readily conclude this narrow degree of geographical separation does not hinder the protestors' ability to disseminate their message. See, e.g., Cmty. for Creative Non-Violence v. Turner, 893 F.2d 1387, 1393 (D.C. Cir. 1990) ("In considering whether a regulation leaves open ample alternative channels of communication, the [Supreme] Court has generally upheld regulations which merely limit expressive activity to a specific part of the regulated area or to a limited time frame."); cf. Hill v. Colorado, 530 U.S. 703, 729 (2000) ("Signs, pictures, and voice itself can cross an 8-foot gap with ease.").

28

Although Appellant does not dispute the protestors' ability to reach their intended audience from the designated areas via "hold[ing] sign[s]," "chant[ing]," or engaging in "other form[s] of communication," Appellant's Br. 37, he contends the Policy fails for lack of adequate alternatives because it does not provide "ample" opportunities to distribute leaflets.[9]  Our inquiry, however, does not rise or fall on the efficacy of a single medium of expression.  The First Amendment affords no special protection to a speaker's "favored or most cost-effective mode of communication," Johnson v. City & County of Philadelphia, 665 F.3d 486, 494 (3d Cir. 2011) (citation and internal quotation marks omitted), and leafleting is not an inalienable right exempted from all forms of government regulation.  See McCullen v. Coakley, 571 F.3d 167, 180 (1st Cir. 2009) ("[H]andbilling is not specially protected."); Horina v. City of Granite City, 538 F.3d 624, 631 (7th Cir. 2008) ("[T]he right to handbill is not absolute and federal courts have determined that governments may enact reasonable restrictions on handbilling that are also consistent with the

---

[9] To the extent Appellant argues the Policy is tantamount to a full-scale ban on leafleting, he mischaracterizes the record.  Indeed, his own experts demonstrate that the Policy renders leafleting less effective, not foreclosed.  See J.A. 283-84.

First Amendment." (internal citation omitted)). Appellant's arguments to the contrary are thus unavailing.

In short, given the limited nature of the prohibition in this case, we have no doubt the designated area affords ample opportunity for protestors to communicate effectively with their intended audience, whether by leafleting, holding signs, giving speeches, or engaging in other expressive activities.

## B.

Therefore, because the Policy's limitation on speech is content neutral, narrowly tailored to achieve a substantial government interest, and allows ample alternative channels of communication, it is a permissible time, place, and manner restriction on speech. Accordingly, the district court correctly granted summary judgment as to Appellant's First Amendment claims against the City and BCPD.

## IV.

Having determined the Policy comports with the First Amendment, we need only briefly address the remaining issues on appeal. Appellant argues the district court erred in (a) granting Officer Early summary judgment on Appellant's First and Fourth Amendment claims on the basis of qualified immunity; and (b) granting Officer Early summary judgment on Appellant's state law claims. Finding no error, we affirm.

30

We first decide whether the district court properly granted qualified immunity to Officer Early on Appellant's First and Fourth Amendment claims. The qualified immunity defense "'protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Bland v. Roberts, 730 F.3d 368, 391 (4th Cir. 2013) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir. 1999)). Consequently, "[i]n determining whether a defendant is entitled to qualified immunity, [we] must decide (1) whether the defendant has violated a constitutional right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct." Id. (citing Walker v. Prince George's Cnty., 575 F.3d 426, 429 (4th Cir. 2009)). Appellant's First and Fourth amendment claims fail on the first prong of this inquiry.

1.

We begin by considering whether Officer Early violated Appellant's First Amendment rights. On this front, Appellant contends that Officer Early is liable for viewpoint discrimination in violation of the First Amendment because he enforced the Policy only against Circus protesters. The record, however, is devoid of any evidence from which a reasonable juror

31

could find that Officer Early arrested Appellant with a content- or viewpoint-based discriminatory purpose. See Pahls v. Thomas, 718 F.3d 1210, 1230 (10th Cir. 2013) ("The Supreme Court has made clear that, for a discrimination claim rooted in the First Amendment, a plaintiff must show that a government official 'acted with discriminatory purpose,'" i.e., that he acted "because of, not merely in spite of, the action's adverse effects upon an identifiable group." (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009))). Rather, as the district court found, "[t]here is nothing to suggest that Officer Early . . . purposely targeted [Appellant] because he was protesting the Circus." See Ross II, 899 F. Supp. 2d 415, 429 n.16 (D. Md. 2012). Thus, the district court properly granted Officer Early qualified immunity on this claim.

2.

Appellant's Fourth Amendment claim, premised on his purportedly unlawful arrests, is similarly infirm. The circumstances of the arrests are straightforward: Officer Early repeatedly ordered Appellant to move the location of his leafleting activity in conformance with the Policy, and Appellant repeatedly refused. Ultimately, after issuing multiple warnings, Officer Early arrested Appellant -- twice -- for the misdemeanor crime of "willfully failing to obey a reasonable and lawful order that a law enforcement officer makes

32

to prevent a disturbance to the public peace." Md. Code Ann., Crim. Law § 10-201(c)(3). The district court, relying on these undisputed facts, concluded that Officer Early had probable cause to effectuate the challenged arrests "sufficient to vitiate any claim of [42 U.S.C.] § 1983 liability." Ross II, 899 F. Supp. 2d at 429. We agree.

A police officer may arrest an individual without a warrant if he "has probable cause to believe that an individual has committed even a very minor criminal offence in his presence[.]" Atwater v. Lago Vista, 532 U.S. 318, 354 (2001). Probable cause exists when the facts and circumstances known to the officer are sufficient to warrant an objectively reasonable person in believing "'that the suspect has committed, is committing, or is about to commit an offense.'" Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)). "'Whether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as shown to the officer, and the contours of the offense thought to be committed by that conduct.'" Rogers v. Pendleton, 249 F.3d 279, 290 (4th Cir. 2001) (quoting Pritchett, 973 F.2d at 314).

Turning first to the "contours" of the offense in question, we observe that Md. Code Ann., Crim. Law § 10-201(c)(3) applies to offenders who "willfully fail to obey a

33

reasonable and lawful order of a law enforcement officer, made to prevent a disturbance of the public peace." Att'y Grievance Comm'n of Maryland v. Mahone, 76 A.3d 1198, 1210 (Md. 2013). Under this subsection, the "'failure to obey a policeman's command to move on when not to do so may endanger the public peace, amounts to disorderly conduct'" in violation of Maryland law. Id. (citation omitted). This crime "is predicated on the law enforcement officer issuing a reasonable and lawful order," Polk v. State, 835 A.2d 575, 580 n.3 (Md. 2003) (internal quotation marks omitted), and as such, the command "cannot be purely arbitrary and . . . not calculated in any way to promote the public order." Mahone, 76 A.3d at 1211 (internal quotation marks and citation omitted).

Prior to each of the disputed arrests, Officer Early verbally ordered Appellant to move his leafleting activity to the designated area. This order was directed at enforcing the Policy, which was, in turn, directed at maintaining the safety, order, and accessibility of the streets and sidewalks. Inasmuch as Appellant refused to heed these repeated requests, Officer Early had probable cause to effectuate both arrests. See Atwater, 532 U.S. at 354. Officer Early thus did not violate

Appellant's Fourth Amendment rights, and the district court correctly found him entitled to qualified immunity.[10]

B.

With respect to Appellant's state law claims, the district court determined his claims of false arrest and false imprisonment could not be sustained because each requires a showing that Appellant was deprived of his liberty without legal justification. See Ross II, 899 F. Supp. 2d at 430 n.16. We agree with the district court's legal premise, see Okwa v. Harper, 757 A.2d 118, 190 (Md. 2000) ("For a successful cause of action based on false arrest or false imprisonment, the plaintiff must establish that 'the defendant deprived him or her of his or her liberty without consent and without legal justification.'" (citation omitted)), and its finding that Appellant failed to make the requisite showing. We conclude, therefore, that the district court properly granted summary judgment in favor of Officer Early.

---

[10] Appellant asserts a largely identical claim for unreasonable seizure under Article 26 of Maryland's Declaration of Rights. Inasmuch as Article 26 protects the same rights as those protected under the Fourth Amendment, see Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 360 (4th Cir. 2010), this claim, too, fails upon a finding of probable cause.

35

V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

WYNN, Circuit Judge, dissenting:

Appellant Aaron Ross was arrested in 2008 and again in 2009 after he refused to obey Officer Wayne Early's orders to stop leafleting in the middle of the sidewalk adjacent to Baltimore's First Mariner Arena, which was hosting the circus. On both occasions, Ross had sought to exercise his First Amendment right to protest the circus's treatment of animals by handing out leaflets to passersby, and on both occasions, Ross was conducting himself in a peaceful and unobtrusive manner. The sole basis for Early's order was that Ross was violating what the majority opinion refers to as Baltimore's "Policy" pertaining to where circus protestors could stand.

But that "Policy" constituted nothing more than an e-mail—copied, pasted, and resent with minor modifications year after year—from Baltimore's city attorney to about a dozen members of the police department and city staff. It is undisputed that the staff attorney's e-mail that formed the only basis of what the majority characterizes as "Policy" was neither adopted by the Baltimore City Council nor disseminated to the public in any systematic manner. And there is little dispute, if any, that the only people who knew about the existence of the e-mail were the unelected city employees who developed and sought to enforce its restrictions.

Simply put, the staff attorney's e-mail does not constitute Baltimore's "Policy." Additionally, the secret nature of Baltimore's restrictions on First Amendment rights warrants the application of heightened scrutiny because of the potential for abuse and selective enforcement associated with the lack of notice and democratic accountability. But even if we were to allow the parties to agree that our review should be under a lower standard of scrutiny, Baltimore's restrictions fail the narrow-tailoring analysis.

It is axiomatic that our most basic notions of due process are jeopardized when speech restrictions are developed secretly in the back offices of city hall rather than publicly in the council chambers. It seems plausible to me that today's decision will encourage local governments to avoid the time-consuming and politically costly exercise of adopting speech-restrictive ordinances in favor of developing speech-restrictive "Policies" at the staff level. Accordingly, I must respectfully dissent from the differing view of my fine colleagues in the majority.[1]

---

[1] The majority and the district court concluded that Baltimore's "Policy" is content neutral and leaves open ample alternative channels of communication. Because I take issue only with (1) the level of scrutiny applied to the restrictions, and (2) the narrow-tailoring analysis that the district court and the majority conducted, I do not discuss either content (Continued)

I.

Most of the salient facts in this case are covered in the majority opinion and the district court's two published opinions, Ross v. Early, 758 F. Supp. 2d 313 (D. Md. 2010) ("Ross I") and Ross v. Early, 899 F. Supp. 2d 415 (D. Md. 2012) ("Ross II"). A few critical points, however, warrant special emphasis.

First, Ross was arrested in 2008 and 2009 for failing to obey Early's orders, which were "aimed at enforcing the City's Protocol." Ross II, 899 F. Supp. 2d at 427. The district court explicitly stated that "[t]he record simply does not support" that Ross was threatening the public safety and that "Ross was in no way blocking or impeding the free flow of patrons attempting to enter or exit the building." Id. Moreover, when Early was asked during his deposition whether he "ultimately arrested Mr. Ross for violating a law and not for violating an e-mail[,]" Early answered, "No, it was both." J.A. 324. Thus, Early's decisions to order Ross to move and to place Ross under arrest were clearly based on Ross's failure to conform to the

_____

neutrality or alternative channels of communication in this dissent.

39

restrictions in the e-mail and not on Ross's interference with pedestrian flow or public safety.

Second, the district court found that the significant government interests that the restrictions were designed to serve were the preservation of "freedom of movement on public streets and sidewalks[,]" Ross I, 758 F. Supp. 2d at 322, as well as "pedestrian safety," Ross II, 899 F. Supp. 2d at 425.

Third, when Ross was arrested in 2008 and 2009, the restrictions were in their fifth and sixth years of enforcement. Nonetheless, the restrictions had not been formally adopted, and there is no evidence that the City took measures to inform the public about them. Additionally, the district court noted in both of its opinions that the police officers' orders were somewhat vague and left the protestors confused. See Ross II, 899 F. Supp. 2d at 427–28 ("Further, at one point Ross is simply told 'red brick,' a reference to the bricked outer portion of the sidewalk, the Protocol's designated area for demonstrations."); Ross I, 758 F. Supp. 2d at 325 ("On the video showing [Ross's] arrest, demonstrators are seen repeatedly expressing confusion about the source of the restrictions and the interaction with their First Amendment rights. The police could not dispel this confusion because they were unable to direct demonstrators to a specific regulation or ordinance and could only instruct them to call the Law Department.").

40

Finally, in Ross II, the district court granted summary judgment to Early and the municipal defendants on all of Ross's claims, with the exception of Ross's Section 1983 claims against the City and the Baltimore City Police Department, which alleged that the speech restrictions were unconstitutional. Ross II, 899 F. Supp. 2d at 421, 432–33. The district court determined that the resolution of these claims turned on a disputed factual question, namely whether the restrictions were generally applicable or "targeted toward animal welfare demonstrators specifically[.]" Id. at 422. The district court held that if the restrictions were generally applicable, they would be constitutional by virtue of the more lenient standard of review that applies to ordinances and statutes. Id. at 421–22 (explaining that under intermediate scrutiny, "a time, place, and manner restriction on speech is narrowly tailored 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989))). The district court went on to explain that if, on the other hand, the restrictions were targeted toward the circus protestors, then they would be "more analogous to an injunction than a statute of general application, and failing to be sufficiently tailored under heightened scrutiny, would be

41

struck down as unconstitutional." Id. The parties then
stipulated that the restrictions were generally applicable.


II.

The First Amendment prohibits the government from
"abridging the freedom of speech . . . or the right of the
people peaceably to assemble[.]" U.S. Const. amend. I; see also
Gitlow v. New York, 268 U.S. 652, 666 (1925) (incorporating the
freedom of speech against the states) and DeJonge v. Oregon, 299
U.S. 353, 364-65 (1937) (incorporating the freedom of assembly
against the states). "Leafletting and commenting on matters of
public concern are classic forms of speech that lie at the heart
of the First Amendment, and speech in public areas is at its
most protected on public sidewalks, a prototypical example of a
traditional public forum." Schenck v. Pro-Choice Network of W.
N.Y., 519 U.S. 357, 377 (1997).

But our constitutional speech rights are not unlimited
because the First Amendment "does not guarantee the right to
communicate one's views at all times and places or in any manner
that may be desired." Heffron v. Int'l Soc'y for Krishna
Consciousness, Inc., 452 U.S. 640, 647 (1981). Thus, "even in a
public forum the government may impose reasonable restrictions
on the time, place, or manner of protected speech, provided the

42

restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

I agree with the majority opinion that Baltimore's "Policy" is content neutral and leaves open ample alternative channels of communication. Content-neutral speech restrictions are subject to one of two standards of scrutiny: heightened or intermediate. See Madsen v. Women's Health Center, Inc., 512 U.S. 753, 764–65 (1994). As discussed below, the main difference between the two standards is the rigor of the narrow-tailoring analysis. Before reaching the narrow-tailoring analysis, however, a court must first select the appropriate standard of scrutiny.

A.

Under the first step of the analysis—selecting the appropriate standard of scrutiny—we are guided by two major Supreme Court decisions: Ward, 491 U.S. at 781, and Madsen, 512 U.S. at 753.[2] When we review "a content-neutral, generally

---

[2] The majority notes that Ross "accepts intermediate scrutiny as the applicable standard of review and challenges only the district court's determination that, under that (Continued)

43

applicable statute, instead of an injunctive order, its
constitutionality [is] assessed under the standard set forth in
Ward[.]" Madsen 512 U.S. at 764. Injunctive orders, by
contrast, "require a somewhat more stringent application of
general First Amendment principles . . . ." Id. at 765. Thus,
in general, to determine whether the appropriate standard in a

---

standard, the Policy is facially constitutional as a reasonable
time, place, and manner restriction on speech." Ante at 10.
But the district court's conclusions of law pertaining to the
First Amendment claim at issue here are reviewable by this
Court, regardless of whether Ross "accepts" those conclusions or
not. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99
(1991) ("When an issue or claim is properly before the court,
the court is not limited to the particular legal theories
advanced by the parties, but rather retains the independent
power to identify and apply the proper construction of governing
law.").

Additionally, although the majority states that "the
parties have stipulated to a set of facts warranting the
application of intermediate scrutiny," ante at 18, the parties'
stipulations simply cannot convert the e-mails sent by an
unelected city lawyer into an ordinance. Because there is
neither an ordinance nor an injunction, this case does not fit
neatly into either the Ward or the Madsen analysis. It,
therefore, remains our duty to ensure that the appropriate level
of scrutiny is applied. See Marbury v. Madison, 5 U.S. 137, 177
(1803) ("It is emphatically the province and duty of the
judicial department to say what the law is."). Moreover, even
if the parties attempted to stipulate to the standard of review,
it should go without saying that "[w]e are not bound to accept,
as controlling, stipulations as to questions of law." Sanford's
Estate v. Comm'r Internal Revenue, 308 U.S. 39, 51 (1939). See
also Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289–90
(1917) ("If the stipulation is to be treated as an agreement
concerning the legal effect of admitted facts, it is obviously
inoperative; since the court cannot be controlled by agreement
of counsel on a subsidiary question of law.").

44

case is heightened or intermediate scrutiny, courts must consider whether the restriction is an injunction or an ordinance. But as this case illustrates, not every speech restriction fits neatly into one category or the other. And when that happens, courts must conduct a fact-intensive inquiry to determine whether the restriction is more like an ordinance or more like an injunction.

Madsen's interpretation of Ward provides a description of the "obvious differences . . . between an injunction and a generally applicable ordinance." Madsen, 512 U.S. at 764. First, and perhaps most importantly, "[o]rdinances represent a legislative choice regarding the promotion of particular societal interests." Injunctions, "by contrast, are remedies imposed for violations (or threatened violations) of a legislative or judicial decree." Id. Second, injunctions "carry greater risks of censorship and discriminatory application than do general ordinances." Id. "'[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." Id. (quoting Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 112–13 (1949)). Third, injunctions "can be tailored by a trial judge to afford more precise relief than a

statute where a violation of the law has already occurred." Id. at 765.

If our analysis of the restriction reveals that it is more like an ordinance, then we would apply the intermediate standard. But if our analysis reveals that the restriction is more like an injunction, then we would undertake a "somewhat more stringent application of general First Amendment principles[.]" Id. To put it simply, although speech-restrictive ordinances and injunctions all must be narrowly tailored, the fit between the speech restriction and the government's goals must be closer with an injunction than with an ordinance. The next section contains a more detailed description of the differences between Ward's intermediate-scrutiny standard and Madsen's heightened-scrutiny standard.

B.

In Ward, a case involving sound-amplification guidelines that applied to all users of a bandshell in Central Park, the Court held that a "regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." Ward, 491 U.S. at 798. The Court went on to explain that the narrow-tailoring requirement is satisfied "'so long as the . . . regulation promotes a substantial government interest

46

that would be achieved less effectively absent the regulation."
Id. at 799 (quoting United States v. Albertini, 472 U.S. 675,
689 (1985)).  But the Supreme Court did not stop there.  It
continued: "To be sure, this standard does not mean that a time,
place, or manner regulation may burden substantially more speech
than is necessary to further the government's legitimate
interests.  Government may not regulate expression in such a
manner that a substantial portion of the burden on speech does
not serve to advance its goals."  Id. at 799.

In Madsen, a case in which abortion protestors were
enjoined from standing within certain "buffer zones" on public
and private property, the Court explained that the "standard
time, place, and manner analysis is not sufficiently rigorous."
Madsen, 512 U.S. at 765.  It held that the inquiry for an
injunction is whether it burdens "no more speech than necessary
to serve a significant government interest."  Id.  In other
words, injunctions may not burden more speech than necessary to
serve a significant government interest, whereas ordinances may
not burden substantially more speech than necessary to serve a
significant government interest.  The difference between the
Ward and Madsen standards is that Ward tolerates a degree of
overinclusiveness whereas Madsen demands that a restriction
burden no more speech than required.

47

Madsen did not, however, change the narrow-tailoring analysis that courts must conduct for ordinances. Even under the less rigorous intermediate scrutiny, "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 799. Put differently, an underinclusive speech restriction also violates the First Amendment, and in this respect, intermediate scrutiny and heightened scrutiny are the same. Thus, if a regulation burdens speech in such a way that it fails to advance the government's goals, the regulation violates the First Amendment because it is not narrowly tailored under either the Madsen standard for injunctions or the Ward standard for ordinances.

In sum, a properly conducted narrow-tailoring analysis examines both whether the restriction is over- or underinclusive. The test for overinclusiveness is more stringent for an injunction than it is for an ordinance, but the test for underinclusiveness is identical for both types of speech restrictions. I turn now to an analysis of the facts of the case to explain why I would apply heightened scrutiny and why, even under intermediate scrutiny, Baltimore's restrictions would fail a properly conducted narrow-tailoring analysis.

III.

A.

Baltimore's restrictions were imposed neither via an injunction nor via an ordinance.  However, it is clear to me that the City's unadopted and secret speech restrictions more resemble an injunction than an ordinance.

In deciding to apply the less-stringent intermediate standard, both the district court and the majority found the generally applicable nature of the restrictions to be dispositive.  This was error because general applicability is only one characteristic of ordinances.  And nothing suggests that it is somehow a dispositive one.  As the Supreme Court noted in Madsen, and as the majority opinion recognizes here, ordinances "represent a legislative choice" and carry fewer "risks of censorship and discriminatory application" than do injunctions.  Madsen, 512 U.S. at 764; ante at 12-13.

By stark contrast, Baltimore's restrictions involved absolutely no legislative choice regarding the promotion of societal interests.  Instead, they were simply made up by an unelected city lawyer.  That unelected city employee wrote the restrictions without notice to the public and without the opportunity for public input that is generally required for ordinances passed pursuant to Maryland state law and pursuant to the Charter for the City of Baltimore.  See Md. Code Ann., Local

Gov't § 9-105 (precluding Maryland counties from adopting acts, ordinances, or resolutions until ten days after a public hearing and requiring the publication of advance notice of the hearing and a summary of the proposed enactment in a newspaper of general circulation once each week for two successive weeks); Charter of Baltimore City art. III, § 14 (requiring legislative acts to "be by ordinance or resolution" and precluding ordinances from taking effect until after three separate readings). The fact that the public never knew—or even could have known—about the existence of the restrictions poses risks of censorship and discriminatory application that are even greater than those risks with injunctions. After all, when a court issues an injunction, it is clear who is bound and what conduct is proscribed. Moreover, the enjoined party's ability to appeal provides an avenue of relief that is not available with a secret regulation.

The majority cites several cases in which other circuits have applied intermediate scrutiny to generally applicable, but unadopted, restrictions on speech. Obviously, this Court is not bound by the decisions of other circuits. But to the extent that the cited cases are offered to guide our analysis, they are easily distinguishable from the facts here because they involve

a legislative delegation of policymaking authority,[3] a one-of-a-kind security situation,[4] or obvious actual notice of the speech restriction.[5]

Here, by contrast, Ross had no idea of the existence of the restrictions until he deposed Early while taking discovery in this lawsuit—a full six months after his second arrest, and a year-and-a-half after his first arrest. Indeed, no evidence suggests that anyone beyond the drafter and a dozen or so recipients of the e-mail containing the restrictions—all of whom were people responsible for enforcing the restrictions—had any knowledge of their existence. There is also no evidence that

---

[3] Saieg v. City of Dearborn, 641 F.3d 727, 730 (6th Cir. 2011) (involving a no-leafleting policy at the Arab International Festival that was developed by the Dearborn police department pursuant to a resolution passed by the City Council that subjected the Festival to "the rules and regulations of the Police Department").

[4] Marcavage v. City of N.Y., 689 F.3d 98, 105 (2d Cir. 2012) (involving the City of New York's demonstration policy that pertained to the Republican National Convention at Madison Square Garden, which presented "extraordinary" security challenges in the wake of the 2001 terrorist attacks). The demonstrators in Marcavage also had actual notice of the restrictions.

[5] Faustin v. City and County of Denver, Colo., 423 F.3d 1192 (10th Cir. 2005) (involving an unwritten total ban on signs and banners on highway overpasses); Int'l Caucus of Labor Comms. v. City of Montgomery, 111 F.3d 1548 (11th Cir. 1997) (involving Montgomery's ban on the placement of information tables on city sidewalks and landscaping strips); Potts v. City of Lafayette, Ind., 121 F.3d 1106 (7th Cir. 1997) (involving the posted prohibition against entering a KKK rally with any item that could be used as a weapon).

the restrictions were enforced only in emergency or otherwise unique security situations. Moreover, even if it could be argued that there was no time to officially adopt the restrictions initially, the City certainly had time to adopt and publicize the restrictions at some point during the five years between their creation and Ross's first arrest.

Today's ruling has troubling implications. After today, generally applicable, albeit secret, speech restrictions are afforded the same level of scrutiny in the Fourth Circuit as duly adopted ordinances. The potential for abuse is great.

Local governments will be able to develop and enforce speech-restrictive "Policies" without having to provide even a whisper of advance notice regarding the existence or content of the restrictions. In the event that the public becomes aware of the secret speech restrictions, there will be no electoral accountability for the unelected employees who developed the restrictions. And, perhaps most troubling, judicial relief will be more difficult to obtain for the person whose speech is restricted via enforcement of a secret "Policy" than it would be for a person whose speech is restricted via the enforcement of an injunction entered against him. The irony, of course, is that the person restricted by the injunction knows exactly what speech or conduct is proscribed, whereas the person restricted

by the secret "Policy" does not—and cannot—know the same until it is too late.

For the foregoing reasons, I would apply the more rigorous narrow-tailoring analysis described in Madsen to Baltimore's unadopted, speech restrictions in this case. I turn now to an explanation of why, even under intermediate scrutiny, I would hold that Baltimore's restrictions are not narrowly tailored and, thus, fail.

B.

Though I believe that heightened scrutiny is the correct standard to apply in this case, even under the lower intermediate scrutiny standard applied by the majority, Baltimore's restrictions fail the narrow-tailoring analysis. As I described above, a properly conducted analysis of a statute or ordinance under intermediate scrutiny requires courts to analyze, at a minimum, both (1) whether the restriction burdens substantially more speech than necessary; and (2) whether the restriction operates "in such a manner that a substantial portion of the burden on speech does not serve to advance [the government's] goals." Ward, 491 U.S. at 799. If the restriction is overinclusive, it fails the first part of the narrow-tailoring analysis. If the restriction is underinclusive, it fails the second part of the narrow-tailoring

53

analysis.[6]  See City of Ladue v. Gilleo, 512 U.S. 43, 51 (1994)

(discussing underinclusiveness in the context of content

neutrality and noting that "[w]hile surprising at first glance,

the notion that a regulation of speech may be impermissibly

underinclusive is firmly grounded in basic First Amendment

principles." (emphasis in original)).

Here, Baltimore's goals are simple and legitimate; they are

to ensure "freedom of movement on public streets and

sidewalks[,]" Ross I, 758 F. Supp. 2d at 322, and to ensure

"pedestrian safety[,]" Ross II, 899 F. Supp. 2d at 425.  The

record contains ample evidence regarding the congestion on the

sidewalks as circus-goers queue up to enter First Mariner Arena.

Additionally, the restrictions do not ban leafleting altogether.

Rather, they require leafleters to stand in specified locations,

all of which are on the same block as the Arena.  Therefore, I

take no issue with the majority's and district court's

conclusion that under Ward, the restrictions do not burden

substantially more speech than necessary and are not

overinclusive.

However, it seems plain to me that the restrictions are

underinclusive because they "regulate expression in such a

_____

[6] The majority and the district court simply fail to
undertake this second part of the narrow-tailoring analysis.

54

manner that a substantial portion of the burden on speech does not serve to advance [the government's] goals." Ward, 491 U.S. at 799. It bears repeating both the burden imposed by the restrictions as well as Baltimore's goals: the burden on speech is the prohibition against leafleting on the sidewalks adjacent to First Mariner Arena, and the goals are to maintain pedestrian flow and safety. The apparent mismatch between the burden on speech and Baltimore's goals is caused by the secret nature of the restrictions.

The record contains still images and videos of Ross's 2008 and 2009 arrests. It is evident that, as the district court found, Ross posed no threat to public safety and did not impede pedestrians while distributing leaflets. Ross II 899 F. Supp. 2d at 427. It is equally evident that the police caused pedestrian congestion while they attempted to explain the restrictions to the (understandably) confused protestors. The protestors' reluctance to stop engaging in peacefully conducted protected speech is understandable because they had neither actual nor constructive knowledge of the restrictions on their First Amendment rights. Indeed, an arrest video shows one protestor calling her lawyer to ask whether the First Amendment protected her right to distribute leaflets on the public sidewalk. Unfortunately for that protestor, not even the world's best First Amendment lawyer could have given a client

55

proper advice in this situation because the only people who knew about Baltimore's First Amendment restrictions were those few recipients of the city attorney's e-mail.

As the majority correctly notes, it is the City's burden to demonstrate that the speech restrictions meet the applicable level of scrutiny.  See Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989).  The City has not met that burden here because the secret restrictions did not, in fact, advance the legitimate goals of maintaining pedestrian flow and safety.  Accordingly, I would hold that Baltimore's restrictions fail even Ward's narrow-tailoring analysis and are, therefore, unconstitutional.


IV.

For the foregoing reasons, I would apply the heightened standard described in Madsen and conclude that Baltimore's speech restrictions are unconstitutional because they burden more speech than necessary to achieve the City's goals.  But even under the less rigorous standard described in Ward, I would conclude that Baltimore's restrictions are unconstitutional because they burden speech in a manner that does not advance the City's goals.  Accordingly, I respectfully dissent.